such hospital or by others under such arrangements. . . ." 42 U.S.C. § 1395x(b). One of the

exclusions from coverage is for items and services that "are not reasonable and necessary for the

diagnosis or treatment of illness or injury or to improve the functioning of a malformed body

member." 42 U.S.C. §1395i(a)(1)(A); 42 U.S.C. § 1395y(a)(1).

49.    Section 1871(a)(1) of the Medicare Act (42 U.S.C. § 1395hh) requires the HHS

Secretary to prescribe such regulations as may be necessary to administer the Medicare Program.

42 C.F.R. 415.102 and 415.120 set forth the regulations applicable to the payment of

Radiological Services by the Medicare Program. 42 C.F. R. 415.172, 60 Fed. Reg. 63124

(December 8, 1995) sets forth the rules governing Teaching Physicians services. 42 C.F.R.

405.350 *et seq.* sets forth the rules governing the liability for payments to providers or suppliers

and handling of incorrect payments, including overpayments.

50.    The Medicare and Medicaid Programs pay for the performance of Radiology

Studies furnished in hospitals only if the test is medically necessary and utilized for diagnostic or

therapeutic purposes in connection with health care services provided to Medicare and Medicaid

beneficiaries. The Medicare and Medicaid Programs only pay for expenses incurred for items

and services which are reasonable and necessary for the diagnosis and treatment of illness or

injury. *See* 42 U.S.C. §§ 1395i(a)(1)(A) and 1395y(a)(1); 42 C.F.R. Parts 405 and 441, 46 Fed.

Reg. 485550 (October 1, 1981); Regulations of Connecticut State Agencies ("R.C.S.A.") § 17b-

102-01 to 17b-102-04. Connecticut General Statutes ("Gen. Stat.") §53a-290. Participating

providers are required to ensure that any services rendered to Medicare recipients are supported

by sufficient evidence of medical necessity. 42 U.S.C. §1320c-5(a)(1). Standing orders or

panels of Radiology Studies or tests are usually not acceptable documentation that tests are

26

reasonable and necessary. *See* OIG's Compliance Program Guidance for Clinical Laboratories, August 1998.

51.    At all times relevant hereto, the Secretary's regulations provided: "The following services are excluded from coverage . . . (k) Any services that are not reasonable and necessary for one of the following purposes: (1) For the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 C.F.R. 411.15(k); 42 C.F.R. Parts 405 and 441, 46 Fed. Reg. 48550 (October 1, 1981); R.C.S.A. §17b-262-441; *see e.g.,* Gen. Stat. §53a-290, also applicable to services provided to Medicaid Program beneficiaries in Connecticut.

52.    When submitting claims for reimbursement to the Medicare or Medicaid Programs the provider is required to Certify Medical Necessity and Program Compliance which certifies: (1) that the services and procedures claimed were medically necessary; (2) that the services claimed were actually provided by the provider making the claim; and (3) that the services and procedures claimed were adequately documented in the patient's medical treatment records.

53.    CMS policy expressly limits payment to services for which there is documentation demonstrating the appropriate level of services required by the patient. *See* Medicare Carriers Manual, Part 3, HCFA Pub. 14-3, § 15016C.1; 42 C.F.R. 415.120 (payment is issued for interpretations of Radiology Studies by qualified radiologists so long as "there is a written report requested for inclusion in the patient's medical record maintained by the hospital.") 42 C.F.R. 415.172 *et seq.;* 60 Fed. Reg. 63124 (December 8, 1995); *see also* R.C.S.A. § 17b-262-443.

54.    Medicare and Medicaid certified hospitals are required to make restitution to the Medicare and Medicaid Programs for overpayments caused by the hospital. *See* 42 U.S.C. § 1320a-7b(a)(3); Medicare Hospital Manual § 485; *see also* 42 C.F.R. 405.350 *et seq.;* 42 C.F.R. § 489.20(b); Medicare Carriers Manual § 7120.2; OIG Compliance Guidelines for Hospitals, 63 Fed. Reg. 8987, 8998 (February 23, 1998); Gen. Stat. § 53a-290, *et seq.*

55.    In most instances, when Radiological Services are provided at Defendant Hospitals or their affiliates to outpatients, the hospital or its affiliate gets paid for the Technical Component and the Radiologist or Radiology Group furnishing the Professional Component is paid only for the Professional Component. The Medicare Program, through the Medicare Part A *fiscal intermediary*, reimburses for the Technical Component of Radiological Services, using a blended payment method to reimburse for the Technical Component of outpatient Radiological Services. *See* 42 C.F.R. 413.122; Medicare Carriers Manual § 255 *et seq.*

56.    If the Technical Component is completed (e.g., images are generated) but the Radiology Study is not medically indicated or is not utilized for diagnostic or therapeutic purposes relative to the patient encounter for which the Study is created, or if no timely interpretation of the study is performed by a qualified radiologist and properly documented, Medicare and Medicaid do not cover the performance of the Study. *See* 42 U.S.C. 1395 y(a)(1)(A); 42 C.F.R. 411.15(k); 42 C.F.R. Parts 405 and 441; 46 Fed. Reg. 48550 (October 1, 1981); R.C.S.A. § 17b-102-01 to 17b-102-04.

28

## VII.    ALLEGATIONS

### A.    YNHH AND YALE

57.    At all times relevant hereto, the Defendants YNHH and Yale were providers of Medicare and Medicaid services. From time to time, Defendants billed Medicare through Cigna, Travelers, MetraHealth, United HealthCare and Empire Medicare Services; at all times they billed Medicaid through the State of Connecticut Department of Social Services.

58.    Yale's Radiology Department was, until recently, under exclusive contract with YNHH to provide Radiology Services to patients at YNHH in accordance with the YNHH Bylaws and the Affiliation Agreement. Yale Radiology faculty are responsible for supervision and oversight of Residents, Fellows and the YNHH Department of Diagnostic Imaging technical staff (which includes hospital radiology managers, technologists, nurses, schedulers, Film Library personnel, patient transport services, and others). Yale is reimbursed by YNHH for this supervision and oversight through funds which originate from the federal hospital reimbursement system (Medicare Part A). Yale is responsible for providing billing services, including the preparation and issuance of bills to the Medicare and Medicaid Programs on behalf of physicians employed by the School of Medicine on a full/part-time basis (whether clinical, teaching, community based or other physicians) who furnish Radiology Services to patients at YNHH. Yale provides these services to the members of its Radiology Department when they furnish the Professional Component of Radiology Services.

59.    At all times relevant hereto, YNHH contracted with Yale's Department of Radiology for the purpose of providing high quality Radiology Services to patients at YNHH. Access to YNHH's diagnostic imaging and therapeutic radiology resources is restricted to physicians who are members of Yale's Department of Radiology or who are designated by the

29

Chief as adjunct members of Yale's Department so as to enable the service to fulfill its obligations for patient care education and research.

60.    In exchange for providing Radiology Services to patients at YNHH pursuant to the Yale/YNHH Affiliation Agreement, Yale is paid large sums of money by YNHH, including compensation for the loss of patient volume due to the redirection of patients from the YNHH Diagnostic Imaging Department to Temple Radiology at the YNHHASC.

61.    Under the terms of the Affiliation Agreement between YNHH and Yale's Department of Radiology, Yale contracted to fulfill a number of duties owed by YNHH to Medicare, Medicaid and its patients.  Yale agreed to provide Radiology Services consistent with the prevailing standard of care and in accordance with the applicable federal, state and local rules and regulations, and in compliance with patient care standards required for participation in the Medicare and Medicaid Programs.  As members of the YNHH Medical Staff, the members of Yale's Department of Radiology pledged, *inter alia,* to refrain from delegating the responsibility for the diagnosis or care of hospitalized patients to a physician who is not qualified to undertake this responsibility or who is not adequately supervised.

62.    At all times pertinent hereto, Bruce McClennan, M.D., was Chairman of Yale's Department of Radiology and Chairman of Yale-New Haven Hospital's Department of Diagnostic Imaging.  His duties and responsibilities include, *inter alia,* implementation of Yale's Medical Billing Compliance Plan; Yale's Radiology Department's and YNHH's Radiology Studies record retention system; and YNHH's Diagnostic Imaging Quality Improvement Plan, each of which he implements with the assistance of his Vice Chairs, Howard Forman, M.D., James Brink, M.D., and Shirley McCarthy, M.D.   Dr. McClennan, with the assistance of his Vice Chairs, is also responsible for providing administration, supervision and teaching services

30

to the YNHH's GME Residency Program and the oversight of all Hospital support services for the Yale Radiology Department, including, but not limited to, the maintenance of the Film Library and the computerized patient record-keeping system known as the DecRad System.

63.    At all times pertinent hereto, David Kessler, M.D., was the Dean of the Yale School of Medicine, and responsible, *inter alia*, for ensuring the integrity of the Medical School education program at Yale; and compliance with all federal and state laws governing medical education, Physicians at Teaching Hospitals ("PATH"), physician billing, and federal and state medical education program funding requirements.

64.    At all times relevant hereto, the Faculty members at Yale's Radiology Department were required to abide by the terms of the Yale School of Medicine's Medical Billing Compliance Program and the rules applicable to participating providers in the Medicare and Medicaid Programs.

65.    At all times relevant hereto, the Defendants represented to the Medicare and Medicaid Programs and to beneficiaries that: (1) they were committed to providing high quality patient care; (2) they had policies and procedures in place to ensure patient safety and that the quality of care provided to such beneficiaries was consistent with the prevailing standard of care and federal and state laws; and (3) they were committed to ethical business practices.

66.    At all times relevant hereto, the Defendants, through the YNHH Quality Improvement Committee and the YNHH Quality Assurance Committee, were responsible for implementing the policies and procedures of the YNHH Department of Diagnostic Imaging's Quality Improvement Plan and the YNHH Quality Assurance Plan.

31

67.     The Dean of the Yale School of Medicine and the Chairman of the Yale Radiology Department, are responsible for implementing and enforcing the Yale School of Medicine's Medical Billing Compliance Program.

68.     Starting, on or before July 1996, the YNHH Department of Diagnostic Imaging has maintained a Quality Improvement Program.  The ostensible purpose of the program is to ensure that improvements in care and performance are sustained and integrated with other departments and services through continuous monitoring and evaluation activities, including but not limited to data collection and monthly analysis and reporting of whether all Diagnostic Imaging reports are being completed within 48 hours as required by departmental policy.  The YNHH Diagnostic Imaging Department is responsible for monitoring and evaluating activities connected with the furnishing of Radiological Services by YNHH and Yale, including the ordering of Radiological Studies and completion of reports to ensure the quality and appropriateness of the care and services provided. *See* YNHH Department of Diagnostic Imaging's Quality Improvement Plan.

69.     The Chairman of the YNHH Diagnostic Imaging Department and Yale's Radiology Department is responsible for ensuring that the YNHH Quality Improvement Plan within the Department of Diagnostic Imaging at YNHH was implemented effectively and that the members of the YNHH Department of Diagnostic Imaging as well as the members of Yale's Radiology Department participated in and complied with the applicable policies and procedures and that corrective measures were taken in a timely fashion to resolve or prevent any deficiencies in compliance.

70.     The computerized billing system utilized by the Defendants Yale and YNHH for the Technical and Professional Components of Radiological Services allows the billing of all

32

payers (including Medicare and Medicaid) for "C" status Radiology Studies which were never

utilized for diagnostic or therapeutic purposes and/or for "P" status Radiology Studies for which

no final report by a Qualified Physician was ever made. An example of this billing practice is set

forth in **EXHIBIT A**. The Technical Component, that is the taking of the X-ray was performed

on February 4, 1999 and reported as a "Completed but not Read" study on or before March 10,

1999. As indicated on the patient invoice, the Professional Component for interpreting the X-ray

was never provided. Nevertheless; the charge for the taking of the X-ray which was never

utilized for diagnostic or therapeutic purposes was paid. This same billing practice is used by the

defendants to bill both Medicare and Medicaid, as well as all other private payers.

71.     Upon information and belief, YNHH programmed the DecRad System to generate

the YNHH Technical Component bill once a study was placed in "C" status so that it could bill

for the study regardless of whether it was properly used. YNHH could have and should have

programmed the system to bill for the Technical Component only after the Study was put into

"F" status but it never did so. This practice has been in place since 1985 and could have been

altered at any time by a simple change in a software option.

72.     Relator Smith estimates that approximately thirty-four percent (34%) of all

patients examined at the YNHH Radiology Department are Medicare beneficiaries and eighteen

percent (18%) are Medicaid beneficiaries.

73.     Relator Smith has uncovered more than seventy-seven thousand (77,000)

Completed but not Read Radiology Studies, and believes that at least ten thousand (10,000) more

Studies were read by Residents or Fellows each year but were never reviewed and approved by a

Qualified Physician. Approximately fifty-two and one half percent (52.5%) of these Studies are

believed to have been taken for Medicare and Medicaid patients. The patient radiology record

33

indicates that no Professional Component was rendered before or after the bill for each such study was submitted to and paid by Medicare or Medicaid.

74.     When YNHH submitted claims to Medicare and Medicaid for payment for the delivery of Radiology Services comprised solely of the Technical Component, involving Radiology Studies which were never utilized for diagnostic or therapeutic purposes, YNHH falsely certified that the Radiology Studies were medically necessary and provided in accordance with the standard of care.

75.     Yale, and YNHH were aware that when YNHH presented and caused to be presented to the Medicare and Medicaid Programs claims for Radiological Studies which had been "Completed but not Read," they were seeking payment for worthless and medically unnecessary items and services in violation of 42 U.S.C. § 1320a–7a(a). *See* 18 U.S.C. § 1035.

76.     Yale and YNHH were aware of the fact that YNHH was improperly submitting claims for Completed but not Read Radiology Studies to obtain payment for Radiological Services that were never rendered. Despite this knowledge, Yale and YNHH failed to take any corrective action or institute procedures to prevent such improper acts and ensure that the Completed but not Read Studies were only billed if a related Professional Component had been furnished to the Medicare or Medicaid beneficiary.

77.     Yale and YNHH were aware of the fact that YNHH had submitted thousands of claims for payment for Completed but not Read Radiology Studies and they concealed and covered up the fact that the Radiology Studies for which they had been paid by the Medicare and Medicaid Programs had no diagnostic or therapeutic use to the beneficiaries in violation of 42 U.S.C. § 1320a-7a. *See also* 18 U.S.C. § 1035.

34

78.    Relator Smith charges that in performing these acts, Defendants Yale and YNHH, through the acts of their agents, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government and the DSS to the damage of the Treasury of the United States and the State of Connecticut in violation of 31 U.S.C. § 3729-3731; 31 U.S.C. § 3802; and Gen. Stat. § 53a-290.

79.    By all of the above, Defendants have risked patient safety and failed to provide the minimum level of care required for billing Medicare and Medicaid. The Services were substandard and inadequate in that:

a.  Defendants performed Radiology Studies on Medicare and Medicaid beneficiaries which were never read or interpreted by properly Qualified Radiologists in a timely fashion relative to the patient encounter when the Studies were taken in accordance with the Medicare and Medicaid Program requirements;

b.  the Studies were never used in connection with the diagnosis and treatment of patients relative to the outpatient encounter when the Studies were taken;

c.  the interpretations of many Radiology Studies performed on Medicare and Medicaid patients were rendered by Residents and Fellows who lacked the required supervision by Qualified Radiologists;

d.  interpretations of Radiology Studies were performed by otherwise unqualified physicians and/or personnel; and

e.  the Studies were never taken or documented.

80.    The policies and practices implemented by the Defendants, continuing up to the present, have encouraged and facilitated the provision of substandard and inadequate Radiological Services to Medicare and Medicaid Program beneficiaries.

35

81.    Patients at YNHH were furnished substandard and inadequate Radiology Services for which the Defendants submitted bills to and received payment from the Medicare and Medicaid Programs.  Examples of this poor patient care practice are reflected on at least 202 Radiology Studies finalized by Dr. Morton Glickman and on other reports interpreted by the following non-physician YNHH personnel, Residents and Fellows:

| | | |
|---|---|---|
| 1. | Sally Howell (non-physician) | 76 Reports |
| 2. | Tony Raccio (non-physician) | 22 Reports |
| 3. | Radiology Studies Reports dictated by various Residents and Fellows finalized by "Autosign". | |

82.    Defendant Hospitals presented and submitted claims to, and received payment from, the Medicare and Medicaid Programs for the Technical Component of these associated with these unread and/or substandard and inadequate interpretations of Radiological Studies.  On information and belief, Defendants also billed Medicare and Medicaid for the Professional Component of those Studies read by unsupervised Residents and Fellows as is alleged below.

83.    Defendant Hospitals were aware of the fact that they were providing substandard and inadequate Radiology Services to Medicare and Medicaid beneficiaries and they knowingly submitted claims for payment from the Medicare and Medicaid Programs for those Services despite their substandard and inadequate nature and the false information contained in the submissions.

84.    The failure by Yale and YNHH to furnish Radiology Services by Qualified Radiologists to Medicare and Medicaid beneficiaries constituted violations of the Defendants' provider contracts with the Programs, the statutes and regulations governing the provision of

36

medical care to Program beneficiaries, the Defendants' internal quality assurance policies and programs and the Defendants' medical billing compliance programs.

85.    All of the above billings for Radiology Studies resulted in improper payments from Medicare and Medicaid for patient services.

**B.    NEW YORK PRESBYTERIAN HOSPITAL AND CORNELL ALONG WITH THEIR AFFILIATED HOSPITALS**

86.    At all times relevant hereto, Defendants New York Presbyterian Hospital and Cornell along with their affiliated Hospitals, the Defendants aforedescribed in paragraphs 12 through 37 were providers of Medicare and Medicaid services in New York.

87.    Defendant Cornell is an entity in the State of New York and is affiliated with Defendant New York Presbyterian Hospital and has an arrangement or contract with Cornell for the provision of Radiology Services.

88.    On July 1, 1999, Plaintiff-Relator Smith commenced his duties as Professor of Radiology in the Academic Clinical Track at Cornell.

89.    On or about July 1999, Plaintiff-Relator Smith also was appointed as member of the medical staff as Attending Radiologist at the New York Presbyterian Hospital.

90.    Pursuant to such employment and appointments, Plaintiff-Relator Smith was required to participate in and abide by, *inter alia*, Cornell Professional Services Billing Compliance Plan; the Cornell University Policy 4.6, Standards of Ethical Conduct; the New York Presbyterian Hospital's Corporate Compliance Plan; and Cornell Physician Organization Policies and Administrative Procedures.

91.    At all times pertinent hereto, Plaintiff-Relator Smith endeavored to meet his contractual, professional and ethical obligations set forth in the aforesaid policies and procedures.

92.    In accordance with such policies and procedures, on or about October 1999, and for a period of at least two and one-half years, Plaintiff-Relator Smith has complained about a number of billing, compliance and patient care issues that have existed at New York Presbyterian Hospital and Cornell. These reports and complaints were specifically directed to H. Dirk Sostman, M.D., Professor and Chairman of the Department of Radiology, Senior Associate Dean for Clinical Affairs of Cornell and Radiologist-In-Chief of New York Presbyterian Hospital. Dr. Sostman has ignored and otherwise neglected to take any corrective action or measures purporting to eliminate the billing, compliance and patient care issues.

93.    The matters about which Plaintiff-Relator Smith reported and complained to H. Dirk Sostman, M.D. and Hospital and Cornell administrations included the following

a.    Improperly billing the Medicare and Medicaid Programs and other payers for Completed but Not Read Radiology Studies, (a) the Studies were never used in connection with the diagnosis or treatment of patients relative to the outpatient patient encounter when the Studies were taken; and/or (b) the Studies were not interpreted by properly qualified radiologists in a timely fashion relative to the patient encounter when the Studies were taken in accordance with the Medicare and Medicaid Program requirements; and/or for which no required documentation has been created, a practice which, upon information and belief is a practice which has been going on at the New York Presbyterian Hospital for at least 6 years (probably longer). (It has always involved the Cerner system for scheduling

38

and reporting of radiology exams and until about 3 years ago, Healthquest was used for Hospital billing and now Eagle is used for Hospital billing.);

b.      A serious problem with the ordering of Radiology Studies at New York Presbyterian Hospital whereby exams are commonly performed without proper documentation of medical necessity.  Upon information and belief, this applies to 10-20% of all of the Radiology Studies performed annually;

c.      The exams that are billed by Cornell are often different than those billed by the New York Presbyterian Hospital for the same patient same exam.  Upon information and belief, this occurs because the Cerner system is not kept up to date with the most recent CPT codes.  In most instances, the University is billing for the correct exam (since the University billing is done based on a paper form) but the Hospital is not (since it uses the Cerner exam);

d.      Numerous patient care issues involving substandard care and compromises of patient safety; and

e.      The Studies were never taken or documented.


# VIII.   CAUSES OF ACTION


## FIRST CAUSE OF ACTION

### VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
[31 U.S.C. 3729, *ET SEQ.*]

94.      The computerized billing system utilized by Defendant Hospitals for the Technical Component of Radiological Services allows (and in most cases is designed for) the billing of all payers at the time the Radiology Study is taken or created, but prior to any proper

39

interpretation and/or report of the Study. Such Studies that have been completed (i.e., images have been taken or generated by a technologist or other personnel), but for which no proper interpretation by a qualified radiologist has been provided and documented, are often tracked by Hospitals as " "C" Status" or "Completed but Not Read" Radiology Studies. "Un-finalized" or "Non-Finalized" Radiology Studies are those Radiology Studies involving "C" Status Studies where no proper interpretation is ever made and/or documented in a timely fashion relative to the patient's diagnosis and treatment during the patient encounter when the Studies were taken; and/or Studies that were never utilized for diagnostic or therapeutic purposes relative to patient encounters when Studies were taken; and/or for which no required documentation has been created.

95.    The billing systems utilized by Defendant Hospitals to submit billings for Radiology Studies to the Medicare and Medicaid Programs are manufactured by one or more of at least 5 manufacturers, IDX Systems Corporation, Siemens Corporation, McKesson Corporation, Cerner Corporation and Eclipsys Corporation, all of which are manufacturers of the billing software and providers or manufacturers of the hardware.

96.    Upon information and belief, Defendant Hospitals, with the assistance of and in concert with the billing system manufacturers, programmed their billing systems, or bought systems already designed, to generate the Technical Component bill once a study was placed in "C" Status so that they could bill for the Radiology Study regardless of whether it was ever interpreted or used in connection with the diagnosis or treatment of a patient's condition. *The Defendant Hospitals could and should have programmed their billing systems to bill for the Technical Component so long as the Study was used in connection with the patient's diagnosis and treatment relative to the patient encounter during which the Study was taken and only after*

40

*the Study was interpreted by a qualified physician and properly documented, but failed to do so.* This practice has been in place since at least 1985 in some Defendant Hospitals and could have been altered at any time by a simple change in a software option.

97.     Defendant Hospitals have and continue to misrepresent through false certifications and improper use of Medicare and Medicaid reimbursement methods. Radiology Studies they have reported as having been completed at their facilities have been utilized in a timely fashion for patient diagnostic or therapeutic purposes and/or have been adequately documented.

98.     Defendant Hospitals presented and submitted claims to, and received payment from, the Medicare and Medicaid Programs for the Technical Component associated with these worthless outpatient "C" Status Radiological Studies.

99.     Defendant Hospitals presented and submitted claims to, and received payment from, the Medicare and Medicaid Programs for the Technical Component associated with the preliminarily read Radiological Studies of outpatients that were not properly interpreted and/or finalized by a qualified radiologist in a timely fashion relative to the diagnosis and treatment of the patient for the patient encounter during which the Study was taken.

100.     When Defendant Hospitals submitted claims to Medicare and Medicaid for payment for the delivery of Radiology Services comprised solely of the Technical Component, involving Radiology Studies which were never utilized for diagnostic or therapeutic purposes, Defendant Hospitals falsely certified that the Radiology Studies were medically necessary and provided in a timely fashion in accordance with the standard of care.

101.     Defendant Hospitals were aware or should have been aware of the fact that they had submitted thousands of claims for payment for outpatient Completed but not Read

41

Radiology Studies and they concealed and covered up the fact that the Radiology Studies for which they had been paid by the Medicare and Medicaid Programs had no diagnostic or therapeutic use to the beneficiaries in violation of 42 U.S.C. § 1320a-7a. *See also* 18 U.S.C. § 1035.

102.    Plaintiff-Relator Smith charges that in performing these acts, Defendant Hospitals, through the acts of their agents, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government to the damage of the Treasury of the United States and the individual states implementing the Medicaid Program in violation of 31 U.S.C. § 3729-3731; 31 U.S.C. § 3802; and Gen. Stat. § 53a-290.

103.    By all of the above, Defendant Hospitals have risked patient safety and failed to provide the minimum level of care required for billing Medicare and Medicaid. The Services were substandard and inadequate in that Defendant Hospitals performed Radiology Studies on outpatient Medicare and Medicaid beneficiaries that were never read or interpreted in time to be utilized in connection with the diagnosis and treatment of the patient relative to the patient encountered during which the Study was taken.

104.    The policies and practices implemented by Defendant Hospitals, continuing up to the present, have encouraged and facilitated the provision of substandard and inadequate Radiological Services to Medicare and Medicaid Program beneficiaries.

105.    The failure by Defendant Hospitals to properly furnish outpatient Radiology Services to Medicare and Medicaid beneficiaries constituted violations of the Defendants' provider contracts with the Programs, the statutes and regulations governing the provision of

42

medical care to Program beneficiaries, the Defendants' internal quality assurance policies and programs and the Defendants' medical billing compliance programs.

106.    All of the above billings for Radiology Studies resulted in improper payments from the Medicare and Medicaid Programs for outpatient patient services.

107.    By virtue of the acts described above, Defendant Hospitals individually and/or in combination or conspiracy, knowingly presented or caused to be presented to officers, employees, or agents of the United States Government and each state implementing the Medicaid Program, false or fraudulent claims for payment or approval, and have used false statements to conceal obligations to refund money to the Medicare and Medicaid Programs.  The United States has been damaged as a result in an amount to be proven at trial.

108.    Defendant Hospitals are each liable to the United States for treble the United States' damages, and an additional amount of $5,000- $11,500 for each false claim.

109.    By virtue of the acts described above, Hospital Defendants knowingly presented or caused to be presented to officers, employees, or agents of the United States Government and various individual States, false or fraudulent claims for payment or approval, and have used false statements to conceal obligations to refund money to the Medicare and Medicaid Programs.  The United States has been damaged as a result in an amount to be proven at trial.

110.    The Hospital Defendants are to the United States for treble the United States' damages, and an additional amount of $5,000 - $11,500 for each false claim submitted to and paid by the Medicare and Medicaid Programs, together with prejudgment interest on the entirety

43

## SECOND CAUSE OF ACTION

**VIOLATIONS OF THE FALSE CLAIMS ACT**
**[31 U.S.C. § 3730(h)]**
**AS AGAINST**
**NEW YORK PRESBYTERIAN HOSPITAL AND CORNELL UNIVERSITY JOAN AND**
**SANFORD I. WEILL MEDICAL CENTER**

111.    On July 1, 1999, Plaintiff-Relator Smith commenced his duties as Professor of Radiology in the Academic Clinical Track at Cornell.

112.    Because of his investigation and reporting of the frauds alleged herein, Plaintiff-Relator Smith was harassed and was discriminated against in the terms and conditions of his employment, by and through the acts of Defendant Cornell, and its officers, agents, and employees, including Dr. Sostman in one or more of the following ways:

a.    Following his reports about his concerns of improper billing, compliance issues and compromises of patient care, as mandated by applicable Hospital and Cornell compliance plans, ethical policies, federal and state laws and professional ethics, Plaintiff-Relator Smith has been repeatedly disregarded, ignored and subjected to harassment by Dr. Sostman;

b.    On or about late June 2002, Defendant New York Presbyterian Hospital implemented a change in administrative privileges for the computer systems whereby Plaintiff-Relator Smith has lost access to some of the administrative computerized systems, access to which is critical to the performance of his administrative and professional functions;

c.    Plaintiff-Relator Smith has been stripped of certain administrative privileges and functions, the result of which impairs his ability to perform some of the integral administrative responsibilities of his position as a Professor and as the Associate Director of at Cornell; and

44

d. On June 28, 2002, Plaintiff-Relator Smith was informed that his employment contract and appointment at Cornell and related medical staff appointment at New York Presbyterian Hospital will not be renewed, effective June 30, 2003.

113.    Defendants New York Presbyterian Hospital and Cornell have acted with reckless disregard for Plaintiff's right to be free of discrimination and retaliation, for the rights of patients to receive ethical and safe medical care and in disregard of the Defendants' obligations to abide by federal laws governing the Medicare and Medicaid Programs as well as their internal policies, procedures and programs purporting to ensure patient safety, ethical professional practice and proper billing for technical and professional procedures furnished to patients by the Hospital, Cornell and their affiliates.

114.    Plaintiff-Relator Smith believes and asserts that he was the object of such discrimination and harassment because of his investigation and reporting of the frauds alleged herein, including his reports of the substandard patient care issues, improper billing practices and falsification of documents to, among others, Dr. Sostman.

115.    Because of the Defendants' retaliatory conduct set forth above, Plaintiff-Relator Smith has suffered actual and special damages in an amount to be proven at trial, together with prejudgment interest thereon. Such damages arise from the fact that Plaintiff-Relator Smith has suffered and will suffer harm to his reputation, loss of income and enjoyment of life's pleasurable activities by the intimidation and coercion, as well as emotional distress caused by the intimidation and coercion and the mental anguish related to being witness to avoidable substandard patient care and illegal medical billing practices.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator Smith prays for the following relief:

1.    An order directing Defendant Hospitals to cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

2.    An accounting from each Defendant Hospital concerning all billings not supported by any legally adequate report;

3.    Judgment against Defendant Hospitals and in favor of the United States in an amount equal to three times the amount of damages the United States Government's Medicare Program has sustained because of Defendant Hospitals' actions, plus a civil penalty of up to $11,500.00 for each violation of 31 U.S.C. § 3729(a) proven at trial;

4.    Judgment against Defendant Hospitals and in favor of the United States in an amount equal to three times the amount of damages the United States Government's Medicaid Program has sustained because of Defendant Hospitals' actions, plus a civil penalty of up to $11,500 for each violation of 31 U.S.C. § 3729(a) proven at trial;

5.    An award to Plaintiff-Relator Smith, of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) including all costs and expenses of this action, expert fees and expenses and reasonable attorneys' fees;

6.    Attorneys' fees, expenses and costs of suit herein incurred; and

7.    Such other and further and different relief, whether preliminary or permanent, legal or equitable as the Court deems just and proper.

X.    DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff-Relator Smith

hereby respectfully demands a trial by jury on all counts herein alleged.

Respectfully submitted,

By:    _____
          Mary Alice Leonhardt
          Federal Bar No. ct 02996

LAW OFFICES OF
MARY ALICE LEONHARDT, LLC
102 Oak Street
Hartford, CT 06106
Tel:    (860) 727-8874
Fax:   (860) 525-2T94

By:_____
          Peter B. Prestley
          Federal Bar No.: ct15799

MADSEN, PRESTLEY
& PARENTEAU, LLC
44 Capitol Avenue, Suite 201
Hartford, CT 06106
Tel:    (860) 246-2466
Fax:   (860) 246-1794

By:    _____
          Mary Louise Cohen

PHILLIPS & COHEN, LLP
2000 Massachusetts Avenue, NW
Washington, DC 20036
Tel:    (202) 833-4567
Fax:   (202) 833-1815

ATTORNEYS FOR
PLAINTIFF-RELATOR SMITH

47

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 10th day of March, a copy of the foregoing was sent via express mail delivery, and addressed to:

Honorable John Ashcroft
United States Department of Justice
Office of the Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

and that three (3) copies have been hand-delivered in accordance with Rule 5 of the Federal Rules of Civil Procedure and Rules 7(d) and 7(e) of the Local Rules of Civil Procedure to:

John Hughes, Esq.
Richard Molot, Esq.
Assistant United States Attorney
Office of the United States Attorney
157 Church Street, 23rd Floor
New Haven, CT 06510

Peter B. Prestley

48