**Exhibit A**

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel* ) | |
| and ROBERT C. SMITH, M.D. ) | **Civil Action** |
| ) | **No.3:02cv01205 (PCD)** |
| **PLAINTIFFS** ) | |
| ) | |
| VS. ) | **False Claims Act Action** |
| ) | **Pursuant to** |
| YALE-NEW HAVEN HOSPITAL, INC, ) | **31 U.S.C. § 3729, *et seq.*** |
| YALE UNIVERSITY, NEW YORK PRESBYTERIAN ) | |
| HOSPITAL AND CORNELL UNIVERSITY JOAN ) | |
| AND SANFORD I. WEILL MEDICAL COLLEGE ) | **NOVEMBER 24, 2004** |
| ) | |
| **DEFENDANTS** ) | |

### THIRD AMENDED COMPLAINT

## I. INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United
States of America arising from false claims and false statements made by the Defendants in
violation of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended ("FCA"). As
alleged herein, all of Defendant Hospitals have violated the FCA by knowingly engaging in
improperly billing and retaining payments from the Medicare and Medicaid Programs for
producing outpatient Radiological Studies (x-rays, films and images) even though (a) the Studies
were never used in connection with the diagnosis or treatment of patients relative to the
outpatient patient encounter when the Studies were taken; (b) the Studies were not interpreted by
properly qualified radiologists in a timely fashion relative to the patient encounter when the
Studies were taken in accordance with the Medicare and Medicaid Program requirements; and/or
(c) the Studies were never taken or documented.

2.      Defendant Hospitals' use of these schemes to bill the Medicare and Medicaid Programs for unallowable fees for outpatient Radiological Services and to retain those fees violates applicable Medicare and Medicaid Program requirements and subjects the Defendants to liability for damages under the FCA.

3.      Yale-New Haven Hospital, Inc.'s hospital system, including its affiliate, Yale University, and the New York Presbyterian Hospital's hospital system, including its affiliate Cornell University Joan and Sanford I. Weill Medical College, are hospitals where Plaintiff-Relator Robert C. Smith, M.D. learned, through the course of his employment, that the Defendant Hospitals were knowingly billing the Medicare Program for diagnostic Radiology Studies that had not been finalized.

4.      The Qui Tam Plaintiff-Relator, Robert C. Smith, M.D., is seeking, through this action, to recover damages and civil penalties arising from claims for payments submitted to the United States Government through the Medicare and Medicaid Programs.  Plaintiff-Relator Smith estimates that Defendant Hospitals are improperly billing the Medicare Program by more than \$24 Million Dollars every year.

## II.    **JURISDICTION**

5.      This is a civil action arising under the laws of the United States to redress violations of the Federal False Claims Act. This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. § 3729, *et seq.*, which provides that the United States District Courts shall have exclusive jurisdiction of actions brought under the FCA, and FCA multi-defendant jurisdiction pursuant to 31 U.S.C. §3732(a).

2

## III.   VENUE

6.      Venue is proper in this District pursuant to 31 U.S.C. § 3732 (a) and the fact that at least one defendant, or in the case of multiple defendants, any one defendant can be found in, resides, transacts business, or has performed acts proscribed by 31 U.S.C. § 3729, *et seq.*, in this district. Venue is further supported by the Senate Report which explained the 1986 addition of this Venue section: "The new section 3732 of title 31 [was added] to modernize the jurisdiction and venue provisions of the False Claims Act, by recognizing the existence of multi-defendant and multi-district frauds against the Government." "Multiple suits, of course, increase the cost to the Government to pursue these cases and have a comparable impact upon the judicial resources required for a complete adjudication." "This expansion of jurisdiction and venue is made with a view to provide for more effective litigation by the Government as well as convenience and fairness." 1986 U.S.C.C.A.N. pp. 5266, 5297 (U.S. Senate Report No. 99-345).7. Further, the consolidation of all of Defendant Hospitals in this jurisdiction in this single action is proper because of common questions of law and fact. Common questions of law and fact include the applicability of the FCA to improper Medicare and Medicaid reimbursement claims paid to each Defendant Hospital for the same types of non-reimbursable outpatient Radiology Studies imaging procedures as set forth herein. The techniques used for such improper billing and receipt of payments are pervasive, widespread and common to all Defendant Hospitals, and include the use of computerized software and hardware equipment which was specifically designed to enable and facilitate such fraudulent billing practices.

3

## IV.   PARTIES

### A.   Plaintiff

7.    Plaintiff-Relator Robert C. Smith, M.D., is a citizen of the United States, a medical doctor licensed to practice medicine in the States of Connecticut and New York and a resident of the State of New York. Plaintiff-Relator Smith brings this action for violations of the Federal False Claims Act on behalf of himself and the United States Government pursuant to 31 U.S.C. § 3730(b)(1). Plaintiff-Relator Smith is currently a law student at the Fordham University School of Law and a radiologist practicing in the State of New York. Plaintiff-Relator Smith was employed by, and a Professor of Radiology and Associate Chair of Information Technology and Systems Administration, Department of Radiology, Cornell University Joan and Sanford I. Weill Medical College, New York Presbyterian Hospital until the summer of 2003. He was formerly employed by Yale University commencing on July 1, 1990 until June 30, 1999. At the time of his most recent appointments at Yale University, Plaintiff-Relator Smith held the positions of Associate Professor, Department of Diagnostic Imaging and Chief, Section of MRI, Department of Diagnostic Imaging at Yale University's School of Medicine; and Director, Magnetic Resonance Imaging Center and attending staff physician at Yale-New Haven Hospital. Plaintiff-Relator Smith is the original source of the allegations alleged herein. There has been no prior public disclosure of these allegations.

### B.   Defendants

8.    Defendant Yale-New Haven Hospital, Inc. ("YNHH") is a not-for-profit, tax exempt, non-stock corporation that is a licensed general hospital. It is a corporation organized and existing under the laws of the State of Connecticut, authorized to do business, and so doing business, with its principal place of business in New Haven, Connecticut. At all times pertaining

4

hereto, YNHH was, and is now, a "provider of services" participating in the Medicare and Medicaid Programs within the meaning of 42 U.S.C. § 1395x(u). YNHH operates a GME Residency Program, which is paid for, at least in part, by the Medicare Program. Residents and Fellows who participate in the YNHH GME Residency Program are trained by faculty members of Yale's School of Medicine ("Teaching Physicians") and attending physicians at the Hospital. YNHH is affiliated with Defendant Yale University pursuant to the terms of an affiliation agreement which became effective in 1965, as subsequently amended (the "Affiliation Agreement"). YNHH is a wholly owned subsidiary of Yale-New Haven Health Services Corporation ("YNHHSC"). YNHH is the sole member of YNHH. The Board of Trustees of YNHH, appointed by YNHHSC, controls the operations of YNHH. The President and CEO of YNHH is also the President and CEO of YNHHSC. The President and CEO of YNHH is a member of the Board of Trustees of YNHH.

9.       Defendant Yale University ("Yale") is a corporation organized and existing under the laws of the State of Connecticut, authorized to do business, and so doing business, with its principal place of business in New Haven, Connecticut. Yale operates a medical school, the School of Medicine. Yale's faculty members at the School of Medicine are responsible for providing both professional services to patients of Yale-New Haven hospital as well as administration, supervision and teaching services to Residents and Fellows, technical support staff and the clinical service departments at Yale-New Haven Hospital. Yale's School of Medicine's faculty members are "providers of services" participating in the Medicare and Medicaid Programs within the meaning of 42 U.S.C. § 1395x(u). Yale is remunerated for professional services to Medicare and Medicaid patients by Medicare's intermediaries and by Connecticut Department of Social Services, respectively. Yale is remunerated for

5

administrative, supervision and teaching services, at least in part, by Yale-New Haven Hospital through the monies the Hospital receives from the Medicare Program as a Teaching Hospital operating a Graduate Medical Education ("GME") Residency Program. Yale also receives monies from the Hospital which supplement the Medicare Program payments for administration, supervision and teaching services. Yale also receives money from the Yale-New Haven Hospital to support salaries of Yale Radiology Department Faculty who provide Radiology Services in the YNHH Emergency Department, as well as money to compensate Yale for revenues it may have lost by virtue of radiology patient volume being shifted to Temple Radiology, an outpatient radiology clinic owned and operated by the Hospital's for-profit affiliate, Yale-New Haven Health Ambulatory Services Corporation ("YNHHASC"). YNHHACS is a subsidiary of Yale-New Haven Health Services Corporation. The Yale Faculty Practice represents the clinical activity of the Faculty at the Yale School of Medicine. The Faculty Group is affiliated with Yale-New Haven Hospital.

10.    Defendant New York Presbyterian Hospital is a corporation existing in the State of New York that at all times pertinent hereto was the employer of Plaintiff-Relator Smith and an affiliate of the Defendant Cornell University Joan and Sanford I. Weill Medical College.

11.    Defendant Cornell University Joan and Sanford I. Weill Medical College ("Cornell") is a corporation existing in the State of New York that at all times pertinent hereto was the employer of Plaintiff-Relator Smith and an affiliate of Defendant New York Presbyterian Hospital.

6

## V. DEFINITIONS

12. Radiological or Radiology Services. The terms "Radiological Services" or "Radiology Services" mean services in which X-rays or other forms of radiant energy (e.g., magnetic resonance imaging and ultrasound or rays from radioactive substances) are utilized for diagnostic or therapeutic purposes, whether furnished on an inpatient or outpatient basis and which otherwise comply with the definition of "Radiological Services" contained in the Medicare Carriers Manual § 256. Radiological Services are comprised of a "Technical Component," involving the performance of a Radiological Study (or test), and a "Professional Component," involving the interpretation (or reading) of the study by a Qualified Physician. Without the Professional Component, the Technical Component alone provides neither diagnostic information nor therapeutic benefit. Radiology Studies taken without diagnostic or therapeutic purpose could be considered harmful because potentially dangerous ionizing radiation is applied without a corresponding benefit to the patient.

13. Radiological or Radiology Studies. The term "Radiological Studies" or "Radiology Studies" means the actual radiology test or procedure taken at Defendant Hospitals or their affiliates that produces a radiology film, study or image.

14. Technical Component. The "Technical Component" of Radiological Services is the actual taking of the Radiology Studies or performance of the tests and the reduction of the hard data results onto a film or other imaging media. It represents the facility portion of the service, e.g., the owner of the equipment. This includes the technologist, specific radiology equipment, film and film processing, and any facility overhead in providing the service. The Technical Component is covered under Medicare Part A for inpatient services and hospital-based services, under Medicare Part B for outpatient services and under the Medicaid Program.

7

15.    Professional Component. This designation identifies the part of the total Radiological Services provided by a Qualified Physician. The "Professional Component" is made up of the interpretive skills a Qualified Physician uses in reading a Radiology Study or test. The "Professional (diagnostic or therapeutic) Component" of the Radiological Services, are services which go hand-in-hand with the Technical Component requested by the patient's physician in order to obtain "Radiological Services." The Professional Component is covered under Medicare Part B and under the Medicaid Program.

16.    Hospitals and Radiology Practice Billing Systems. The majority of Defendant Hospitals' billing systems currently in use nationwide are manufactured by IDX Corporation (IDXRad, formerly DecRad), Cerner Corporation, Eclipsys Corporation, McKesson Corporation (e.g., Healthquest) and Siemens Corporation (e.g., Eagle). At nearly all Defendant Hospitals, the Hospital will employ or contract with a group of radiologists to provide interpretations of all imaging Studies. The Hospital and group of radiologists will typically share all or part of the computer systems used to gather patient demographic (and billing) information, schedule radiology services, track radiology services, document completion of radiology services, and report and archive the reports of Radiology Services. The group of radiologists will bill for the professional component of all radiology services provided at each Hospital and/or their affiliated entities. Some of the Hospital billing computer systems operate separately from the radiology group computer systems to bill the Technical Component of Radiology Services. In almost all Hospitals, the Hospital billing system used to bill the Technical Component will interact or communicate with the systems used by the radiologists to bill for the Professional Component. Defendant Hospitals' billing systems (either directly or via intermediary hardware and/or software) provide the vehicle to register and order Radiology Studies via direct entry, track

8

patient status and history, and control film and image management. At the time a Radiology Study is produced and images or other image data are obtained (or even in the absence of such services being provided), a technologist (usually employed by the Hospital) will "complete" the exam that was (or was supposed to be) performed via electronic or other entry in the Hospital computer system. In almost all Hospitals, this is the point at which Hospital billing is then initiated. Defendant Hospitals' billing and related computer systems initiate results and archive radiology reporting dating back to date of the system's implementation at the user facility. They also provide the appropriate tools for the reporting of the results of radiology services, including physician electronic signing of reports. Many of the applications of these systems can be linked directly between the hospital and its group of radiologists to permit a seamless patient record documentation, reporting and billing.

17.      For example, the "DecRad System" (produced by IDX Corporation) is the Radiology information application for the Computerized Information ("CI") System which supports Yale's and YNHH's Radiology departmental functions. It provides the vehicle to register and order Radiology Studies via direct entry, track patient status and history, and control film management. This system initiates results and it archives radiology reporting dating back to 1985. It also provides the appropriate tool for bar code processing, document writing sign-off monitoring, and user defined report writing. This application is linked directly between the YNHH and Yale's School of Medicine's Radiology Department to permit a seamless patient record documentation, reporting and billing system. The DecRad System is utilized by YNHH, Yale and YNHHASC. It receives automated data transfer ("ADT") information and patient orders from the YNHH CI System and returns results of those orders back for presentation to clinicians.

9

a.      When a patient is scheduled for a Radiology Study, the study is listed in the DecRad System as "S" (Scheduled) status.

b.      Once the Study is completed by a radiology technologist, the exam status is changed to "C" (Completed) status. Until the Study is read by a Resident, Fellow or Qualified Radiologist and a report is dictated and entered into the DecRad system, the examination will remain in "C" status. Any Radiology Study in "C" status will have no report associated with it.

c.      When a report is dictated and placed into the DecRad system, the exam status is changed to "P" (Preliminary Report).

d.      Reports of Studies interpreted and dictated by a Qualified Radiologist become final after the radiologist has reviewed, edited and approved the transcribed report and certified it with his or her electronic signature. Reports of Studies dictated by a Resident or Fellow must be reviewed, edited and/or approved by the Teaching Physician. After review, the Teaching Physician finalizes the report using his or her electronic signature to sign its certification. Upon finalization the indicated report status is changed to "F" (Finalized). Whether the study is interpreted initially by a Qualified Radiologist, Resident, Fellow or Clinical Physician, proper finalization and certification of the report is required for the Professional Component of Radiology Services to be billed to the Medicare and Medicaid Programs under applicable billing regulations.

## VI.    BACKGROUND

18.     The Secretary of the United States Department of Health and Human Services ("Secretary" and "HHS") is responsible for, *inter alia*, implementing the provisions of Title

10

XVIII of the Social Security Act (the "Medicare Program"), as amended, 42 U.S.C. § 1395, *et seq.* (the "Medicare Act"). The Secretary administers the Medicare Program through the Center for Medicare and Medicaid Services ("CMS"). In turn, the Secretary and CMS contract with private organizations (intermediaries and carriers) to determine the amounts payable to providers for covered services furnished to Medicare and Medicaid beneficiaries and to make payment. The intermediaries and carriers are required by their contract to give effect to law, regulations and rulings, as well as general instructions issued by CMS and found in Manuals and intermediary letters, when determining whether and how much payment is to be made to providers for services furnished to Medicare and Medicaid beneficiaries.

19.     Congress enacted the Medicaid Program in 1965 to provide a comprehensive range of medical services to both the disabled and the poor. Medicaid is financed by federal and state funds. For example, in Connecticut, the State Department of Social Services ("DSS") administers the Medicaid Program.

20.     Part A of the Medicare Program provides generally for the payment of hospital services furnished to inpatients and outpatients. Part B of the Medicare Program pays for various health services not covered by Part A, primarily professional services including those of physicians.

21.     To participate in the Medicare Program, hospitals enter into "provider agreements" with the HHS Secretary. *See* 42 U.S.C. § 1395cc. The Medicare Program pays the hospital directly for covered inpatient and outpatient services provided to Medicare beneficiaries except for any deductible or coinsurance, which are collected from the beneficiaries. *Id.* § 1395cc.

11

22.     In their capacity as Medicare providers, hospitals are paid for all inpatient and
outpatient hospital services they provide to Medicare beneficiaries unless such services are
specifically excluded from coverage under Section 1862 of the Social Security Act (42 U.S.C. §
1395y). Inpatient hospital services are defined in the Act as including: "(1) bed and board; (2)
such nursing services and other related services, such use of hospital facilities, and such medical
social services as are ordinarily furnished by the hospital for the care and treatment of inpatients,
and such drugs, biologicals, supplies, appliances, and equipment, for use in the hospital, as are
ordinarily furnished by such hospital for the care and treatment of inpatients; and (3) such other
diagnostic or therapeutic items or services, furnished by the hospital or by others under
arrangements with them made by the hospital, as are ordinarily furnished to inpatients either by
such hospital or by others under such arrangements. . . ." 42 U.S.C. § 1395x(b). One of the
exclusions from coverage is for items and services that "are not reasonable and necessary for the
diagnosis or treatment of illness or injury or to improve the functioning of a malformed body
member." 42 U.S.C. §1395i(a)(1)(A); 42 U.S.C. § 1395y(a)(1).

23.     Section 1871(a)(1) of the Medicare Act (42 U.S.C. § 1395hh) requires the HHS
Secretary to prescribe such regulations as may be necessary to administer the Medicare Program.
42 C.F.R. 415.102 and 415.120 set forth the regulations applicable to the payment of
Radiological Services by the Medicare Program. 42 C.F. R. 415.172, 60 Fed. Reg. 63124
(December 8, 1995) sets forth the rules governing Teaching Physicians services. 42 C.F.R.
405.350 *et seq.* sets forth the rules governing the liability for payments to providers or suppliers
and handling of incorrect payments, including overpayments.

24.     The Medicare and Medicaid Programs pay for the performance of Radiology
Studies furnished in hospitals only if the test is medically necessary and utilized for diagnostic or

12

therapeutic purposes in connection with health care services provided to Medicare and Medicaid beneficiaries. The Medicare and Medicaid Programs only pay for expenses incurred for items and services which are reasonable and necessary for the diagnosis and treatment of illness or injury. *See* 42 U.S.C. §§ 1395i(a)(1)(A) and 1395y(a)(1); 42 C.F.R. Parts 405 and 441, 46 Fed. Reg. 485550 (October 1, 1981); Regulations of Connecticut State Agencies ("R.C.S.A.") § 17b-102-01 to 17b-102-04. Connecticut General Statutes ("Gen. Stat.") §53a-290. Participating providers are required to ensure that any services rendered to Medicare recipients are supported by sufficient evidence of medical necessity. 42 U.S.C. §1320c-5(a)(1). Standing orders or panels of Radiology Studies or tests are usually not acceptable documentation that tests are reasonable and necessary. *See* OIG's Compliance Program Guidance for Clinical Laboratories, August 1998.

25.    At all times relevant hereto, the Secretary's regulations provided: "The following services are excluded from coverage . . . (k) Any services that are not reasonable and necessary for one of the following purposes: (1) For the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 C.F.R. 411.15(k); 42 C.F.R. Parts 405 and 441, 46 Fed. Reg. 48550 (October 1, 1981); R.C.S.A. §17b-262-441; *see e.g.,* Gen. Stat. §53a-290, also applicable to services provided to Medicaid Program beneficiaries in Connecticut.

26.    When submitting claims for reimbursement to the Medicare or Medicaid Programs the provider is required to Certify Medical Necessity and Program Compliance which certifies: (1) that the services and procedures claimed were medically necessary; (2) that the services claimed were actually provided by the provider making the claim; and (3) that the

13

services and procedures claimed were adequately documented in the patient's medical treatment records.

27.     CMS policy expressly limits payment to services for which there is documentation demonstrating the appropriate level of services required by the patient. *See* Medicare Carriers Manual, Part 3, HCFA Pub. 14-3, § 15016C.1; 42 C.F.R. 415.120 (payment is issued for interpretations of Radiology Studies by qualified radiologists so long as "there is a written report requested for inclusion in the patient's medical record maintained by the hospital.") 42 C.F.R. 415.172 *et seq.;* 60 Fed. Reg. 63124 (December 8, 1995); *see also* R.C.S.A. § 17b-262-443.

28.     Medicare and Medicaid certified hospitals are required to make restitution to the Medicare and Medicaid Programs for overpayments caused by the hospital. *See* 42 U.S.C. § 1320a-7b(a)(3); Medicare Hospital Manual § 485; *see also* 42 C.F.R. 405.350 *et seq.;* 42 C.F.R. § 489.20(b); Medicare Carriers Manual § 7120.2; OIG Compliance Guidelines for Hospitals, 63 Fed. Reg. 8987, 8998 (February 23, 1998); Gen. Stat. § 53a-290, *et seq.*

29.     In most instances, when Radiological Services are provided at Defendant Hospitals or their affiliates to outpatients, the hospital or its affiliate gets paid for the Technical Component and the Radiologist or Radiology Group furnishing the Professional Component is paid only for the Professional Component. The Medicare Program, through the Medicare Part A *fiscal intermediary*, reimburses for the Technical Component of Radiological Services, using a blended payment method to reimburse for the Technical Component of outpatient Radiological Services. *See* 42 C.F.R. 413.122; Medicare Carriers Manual § 255 *et seq.*

30.     If the Technical Component is completed (e.g., images are generated) but the Radiology Study is not medically indicated or is not utilized for diagnostic or therapeutic

14

purposes relative to the patient encounter for which the Study is created, or if no timely

interpretation of the study is performed by a qualified radiologist and properly documented,

Medicare and Medicaid do not cover the performance of the Study. *See* 42 U.S.C. 1395

y(a)(1)(A); 42 C.F.R. 411.15(k); 42 C.F.R. Parts 405 and 441; 46 Fed. Reg. 48550 (October 1,

1981); R.C.S.A. § 17b-102-01 to 17b-102-04.

## VII.    ALLEGATIONS

### A.    YNHH AND YALE

31.    At all times relevant hereto, the Defendants YNHH and Yale were providers of

Medicare and Medicaid services. From time to time, Defendants billed Medicare through Cigna,

Travelers, MetraHealth, United HealthCare and Empire Medicare Services; at all times they

billed Medicaid through the State of Connecticut Department of Social Services.

32.    Yale's Radiology Department was, until recently, under exclusive contract with

YNHH to provide Radiology Services to patients at YNHH in accordance with the YNHH

Bylaws and the Affiliation Agreement. Yale Radiology faculty are responsible for supervision

and oversight of Residents, Fellows and the YNHH Department of Diagnostic Imaging technical

staff (which includes hospital radiology managers, technologists, nurses, schedulers, Film

Library personnel, patient transport services, and others). Yale is reimbursed by YNHH for this

supervision and oversight through funds which originate from the federal hospital reimbursement

system (Medicare Part A). Yale is responsible for providing billing services, including the

preparation and issuance of bills to the Medicare and Medicaid Programs on behalf of physicians

employed by the School of Medicine on a full/part-time basis (whether clinical, teaching,

community based or other physicians) who furnish Radiology Services to patients at YNHH.

15

Yale provides these services to the members of its Radiology Department when they furnish the Professional Component of Radiology Services.

33.    At all times relevant hereto, YNHH contracted with Yale's Department of Radiology for the purpose of providing high quality Radiology Services to patients at YNHH. Access to YNHH's diagnostic imaging and therapeutic radiology resources is restricted to physicians who are members of Yale's Department of Radiology or who are designated by the Chief as adjunct members of Yale's Department so as to enable the service to fulfill its obligations for patient care education and research.

34.    In exchange for providing Radiology Services to patients at YNHH pursuant to the Yale/YNHH Affiliation Agreement, Yale is paid large sums of money by YNHH, including compensation for the loss of patient volume due to the redirection of patients from the YNHH Diagnostic Imaging Department to Temple Radiology at the YNHHASC.

35.    Under the terms of the Affiliation Agreement between YNHH and Yale's Department of Radiology, Yale contracted to fulfill a number of duties owed by YNHH to Medicare, Medicaid and its patients. Yale agreed to provide Radiology Services consistent with the prevailing standard of care and in accordance with the applicable federal, state and local rules and regulations, and in compliance with patient care standards required for participation in the Medicare and Medicaid Programs. As members of the YNHH Medical Staff, the members of Yale's Department of Radiology pledged, *inter alia,* to refrain from delegating the responsibility for the diagnosis or care of hospitalized patients to a physician who is not qualified to undertake this responsibility or who is not adequately supervised.

36.    At all times pertinent hereto, Bruce McClennan, M.D., was Chairman of Yale's Department of Radiology and Chairman of Yale-New Haven Hospital's Department of

16

Diagnostic Imaging. His duties and responsibilities include, *inter alia*, implementation of Yale's Medical Billing Compliance Plan; Yale's Radiology Department's and YNHH's Radiology Studies record retention system; and YNHH's Diagnostic Imaging Quality Improvement Plan, each of which he implements with the assistance of his Vice Chairs, Howard Forman, M.D., James Brink, M.D., and Shirley McCarthy, M.D. Dr. McClennan, with the assistance of his Vice Chairs, is also responsible for providing administration, supervision and teaching services to the YNHH's GME Residency Program and the oversight of all Hospital support services for the Yale Radiology Department, including, but not limited to, the maintenance of the Film Library and the computerized patient record-keeping system known as the DecRad System.

37.     At all times pertinent hereto, David Kessler, M.D., was the Dean of the Yale School of Medicine, and responsible, *inter alia*, for ensuring the integrity of the Medical School education program at Yale; and compliance with all federal and state laws governing medical education, Physicians at Teaching Hospitals ("PATH"), physician billing, and federal and state medical education program funding requirements.

38.     At all times relevant hereto, the Faculty members at Yale's Radiology Department were required to abide by the terms of the Yale School of Medicine's Medical Billing Compliance Program and the rules applicable to participating providers in the Medicare and Medicaid Programs.

39.     At all times relevant hereto, the Defendants represented to the Medicare and Medicaid Programs and to beneficiaries that: (1) they were committed to providing high quality patient care; (2) they had policies and procedures in place to ensure patient safety and that the quality of care provided to such beneficiaries was consistent with the prevailing standard of care and federal and state laws; and (3) they were committed to ethical business practices.

17

40. At all times relevant hereto, the Defendants, through the YNHH Quality Improvement Committee and the YNHH Quality Assurance Committee, were responsible for implementing the policies and procedures of the YNHH Department of Diagnostic Imaging's Quality Improvement Plan and the YNHH Quality Assurance Plan.

41. The Dean of the Yale School of Medicine and the Chairman of the Yale Radiology Department, are responsible for implementing and enforcing the Yale School of Medicine's Medical Billing Compliance Program.

42. Starting, on or before July 1996, the YNHH Department of Diagnostic Imaging has maintained a Quality Improvement Program. The ostensible purpose of the program is to ensure that improvements in care and performance are sustained and integrated with other departments and services through continuous monitoring and evaluation activities, including but not limited to data collection and monthly analysis and reporting of whether all Diagnostic Imaging reports are being completed within 48 hours as required by departmental policy. The YNHH Diagnostic Imaging Department is responsible for monitoring and evaluating activities connected with the furnishing of Radiological Services by YNHH and Yale, including the ordering of Radiological Studies and completion of reports to ensure the quality and appropriateness of the care and services provided. *See* YNHH Department of Diagnostic Imaging's Quality Improvement Plan.

43. The Chairman of the YNHH Diagnostic Imaging Department and Yale's Radiology Department is responsible for ensuring that the YNHH Quality Improvement Plan within the Department of Diagnostic Imaging at YNHH was implemented effectively and that the members of the YNHH Department of Diagnostic Imaging as well as the members of Yale's Radiology Department participated in and complied with the applicable policies and procedures

18

and that corrective measures were taken in a timely fashion to resolve or prevent any deficiencies in compliance.

44.     The computerized billing system utilized by the Defendants Yale and YNHH for the Technical and Professional Components of Radiological Services allows the billing of all payers (including Medicare and Medicaid) for "C" status Radiology Studies which were never utilized for diagnostic or therapeutic purposes and/or for "P" status Radiology Studies for which no final report by a Qualified Physician was ever made. The Technical Component, that is the taking of the X-ray was performed on February 4, 1999 and reported as a "Completed but not Read" study on or before March 10, 1999. As indicated on the patient invoice, the Professional Component for interpreting the X-ray was never provided. Nevertheless; the charge for the taking of the X-ray which was never utilized for diagnostic or therapeutic purposes was paid. This same billing practice is used by the defendants to bill both Medicare and Medicaid, as well as all other private payers.

45.     Upon information and belief, YNHH programmed the DecRad System to generate the YNHH Technical Component bill once a study was placed in "C" status so that it could bill for the study regardless of whether it was properly used. YNHH could have and should have programmed the system to bill for the Technical Component only after the Study was put into "F" status but it never did so. This practice has been in place since 1985 and could have been altered at any time by a simple change in a software option.

46.     Relator Smith estimates that approximately thirty-four percent (34%) of all patients examined at the YNHH Radiology Department are Medicare beneficiaries and eighteen percent (18%) are Medicaid beneficiaries.

19

47.     Relator Smith has uncovered more than seventy-seven thousand (77,000)

Completed but not Read Radiology Studies, and believes that at least ten thousand (10,000) more Studies were read by Residents or Fellows each year but were never reviewed and approved by a Qualified Physician. Approximately fifty-two and one half percent (52.5%) of these Studies are believed to have been taken for Medicare and Medicaid patients. The patient radiology record indicates that no Professional Component was rendered before or after the bill for each such study was submitted to and paid by Medicare or Medicaid.

48.     When YNHH submitted claims to Medicare and Medicaid for payment for the delivery of Radiology Services comprised solely of the Technical Component, involving Radiology Studies which were never utilized for diagnostic or therapeutic purposes, YNHH falsely certified that the Radiology Studies were medically necessary and provided in accordance with the standard of care.

49.     Yale, and YNHH were aware that when YNHH presented and caused to be presented to the Medicare and Medicaid Programs claims for Radiological Studies which had been "Completed but not Read," they were seeking payment for worthless and medically unnecessary items and services in violation of 42 U.S.C. § 1320a–7a(a). *See* 18 U.S.C. § 1035.

50.     Yale and YNHH were aware of the fact that YNHH was improperly submitting claims for Completed but not Read Radiology Studies to obtain payment for Radiological Services that were never rendered. Despite this knowledge, Yale and YNHH failed to take any corrective action or institute procedures to prevent such improper acts and ensure that the Completed but not Read Studies were only billed if a related Professional Component had been furnished to the Medicare or Medicaid beneficiary.

20

51.    Yale and YNHH were aware of the fact that YNHH had submitted thousands of claims for payment for Completed but not Read Radiology Studies and they concealed and covered up the fact that the Radiology Studies for which they had been paid by the Medicare and Medicaid Programs had no diagnostic or therapeutic use to the beneficiaries in violation of 42 U.S.C. § 1320a-7a. *See also* 18 U.S.C. § 1035.

52.    Relator Smith charges that in performing these acts, Defendants Yale and YNHH, through the acts of their agents, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government and the DSS to the damage of the Treasury of the United States and the State of Connecticut in violation of 31 U.S.C. § 3729-3731; 31 U.S.C. § 3802; and Gen. Stat. § 53a-290.

53.    By all of the above, Defendants have risked patient safety and failed to provide the minimum level of care required for billing Medicare and Medicaid. The Services were substandard and inadequate in that:

a.    Defendants performed Radiology Studies on Medicare and Medicaid beneficiaries which were never read or interpreted by properly Qualified Radiologists in a timely fashion relative to the patient encounter when the Studies were taken in accordance with the Medicare and Medicaid Program requirements;

b.    the Studies were never used in connection with the diagnosis and treatment of patients relative to the outpatient encounter when the Studies were taken;

c.    the interpretations of many Radiology Studies performed on Medicare and Medicaid patients were rendered by Residents and Fellows who lacked the required supervision by Qualified Radiologists;

21

d.     interpretations of Radiology Studies were performed by otherwise unqualified physicians and/or personnel; and

e.     the Studies were never taken or documented.

54.    The policies and practices implemented by the Defendants, continuing up to the present, have encouraged and facilitated the provision of substandard and inadequate Radiological Services to Medicare and Medicaid Program beneficiaries.

55.    Patients at YNHH were furnished substandard and inadequate Radiology Services for which the Defendants submitted bills to and received payment from the Medicare and Medicaid Programs. Examples of this poor patient care practice are reflected on at least 202 Radiology Studies finalized by Dr. Morton Glickman and on other reports interpreted by the following non-physician YNHH personnel, Residents and Fellows:

| | | |
|---|---|---|
| a. | Sally Howell (non-physician) | 76 Reports |
| b. | Tony Raccio (non-physician) | 22 Reports |

c.     Radiology Studies Reports dictated by various Residents and Fellows finalized by "Autosign".

56.    Defendant Hospitals presented and submitted claims to, and received payment from, the Medicare and Medicaid Programs for the Technical Component of these associated with these unread and/or substandard and inadequate interpretations of Radiological Studies. On information and belief, Defendants also billed Medicare and Medicaid for the Professional Component of those Studies read by unsupervised Residents and Fellows as is alleged below.

57.    Defendant Hospitals were aware of the fact that they were providing substandard and inadequate Radiology Services to Medicare and Medicaid beneficiaries and they knowingly submitted claims for payment from the Medicare and Medicaid Programs for those Services

22

despite their substandard and inadequate nature and the false information contained in the submissions.

58.      The failure by Yale and YNHH to furnish Radiology Services by Qualified Radiologists to Medicare and Medicaid beneficiaries constituted violations of the Defendants' provider contracts with the Programs, the statutes and regulations governing the provision of medical care to Program beneficiaries, the Defendants' internal quality assurance policies and programs and the Defendants' medical billing compliance programs.

59.      All of the above billings for Radiology Studies resulted in improper payments from Medicare and Medicaid for patient services.

## B.      NEW YORK PRESBYTERIAN HOSPITAL AND CORNELL ALONG WITH THEIR AFFILIATED HOSPITALS

60.      At all times relevant hereto, Defendants New York Presbyterian Hospital and Cornell were providers of Medicare and Medicaid services in New York.

61.      Defendant Cornell is an entity in the State of New York and is affiliated with Defendant New York Presbyterian Hospital and has an arrangement or contract with Cornell for the provision of Radiology Services.

62.      On July 1, 1999, Plaintiff-Relator Smith commenced his duties as Professor of Radiology in the Academic Clinical Track at Cornell.

63.      On or about July 1999, Plaintiff-Relator Smith also was appointed as member of the medical staff as Attending Radiologist at the New York Presbyterian Hospital.

64.      Pursuant to such employment and appointments, Plaintiff-Relator Smith was required to participate in and abide by, *inter alia*, Cornell Professional Services Billing

23

Compliance Plan; the Cornell University Policy 4.6, Standards of Ethical Conduct; the New York Presbyterian Hospital's Corporate Compliance Plan; and Cornell Physician Organization Policies and Administrative Procedures.

65.    At all times pertinent hereto, Plaintiff-Relator Smith endeavored to meet his contractual, professional and ethical obligations set forth in the aforesaid policies and procedures.

66.    In accordance with such policies and procedures, on or about October 1999, and for a period of at least two and one-half years, Plaintiff-Relator Smith has complained about a number of billing, compliance and patient care issues that have existed at New York Presbyterian Hospital and Cornell. These reports and complaints were specifically directed to H. Dirk Sostman, M.D., Professor and Chairman of the Department of Radiology, Senior Associate Dean for Clinical Affairs of Cornell and Radiologist-In-Chief of New York Presbyterian Hospital in e-mails from February and June 2002, the content of which is incorporated by reference herein. Dr. Sostman has ignored and otherwise neglected to take any corrective action or measures purporting to eliminate the billing, compliance and patient care issues.

67.    The matters about which Plaintiff-Relator Smith reported and complained to H. Dirk Sostman, M.D. and Hospital and Cornell administrations included the following:

a.    Improperly billing the Medicare and Medicaid Programs and other payers for Completed but Not Read Radiology Studies, (a) the Studies were never used in connection with the diagnosis or treatment of patients relative to the outpatient patient encounter when the Studies were taken; and/or (b) the Studies were not interpreted by properly qualified radiologists in a timely fashion relative to the patient encounter when the Studies were taken in accordance with the Medicare and Medicaid Program

24

requirements; and/or for which no required documentation has been created, a practice which, upon information and belief is a practice which has been going on at the New York Presbyterian Hospital for at least 6 years (probably longer). (It has always involved the Cerner system for scheduling and reporting of radiology exams and until about 3 years ago, Healthquest was used for Hospital billing and now Eagle is used for Hospital billing.);

    b.    A serious problem with the ordering of Radiology Studies at New York Presbyterian Hospital whereby exams are commonly performed without proper documentation of medical necessity. Upon information and belief, this applies to 10-20% of all of the Radiology Studies performed annually;

    c.    The exams that are billed by Cornell are often different than those billed by the New York Presbyterian Hospital for the same patient same exam. Upon information and belief, this occurs because the Cerner system is not kept up to date with the most recent CPT codes. In most instances, the University is billing for the correct exam (since the University billing is done based on a paper form) but the Hospital is not (since it uses the Cerner exam);

    d.    Numerous patient care issues involving substandard care and compromises of patient safety; and

    e.    The Studies were never taken or documented.

68.    In October 2002, Plaintiff-Relator Smith wrote to Antonio Gotto, M.D., the Dean of the Weill Medical College of Cornell University. In this letter, the content of which is incorporated by reference, Dr. Smith reported his concerns and beliefs that Dr. Sostman had (1) acted in violation of the University Standards of Ethical Conduct, the Medical College Professional Services Billing Compliance

25

plan, and the provisions of the faculty handbook; (2) created a hostile work environment in the radiology department and needlessly placed patients, faculty and the university reputation in harms way; and (3) shown intolerance toward others through bullying, intimidation and threatening behavior through his actions against Dr. Smith, whereby he had informed Dr. Smith of his intention not to honor the university contractual obligation with regard to the terms of the contract for faculty appointment. Dr. Smith further advised that he had complained to Dr. Sostman in well-documented communications about serious problems in the radiology department relating to patient care, patient safety, billing and compliance. He also cited to several specific examples of the retaliation foisted upon him by Dr. Sotsman. In addition, Dr. Smith reported the fact that Dr. Sostman had allowed a member of the radiology faculty to perform even complicated MRI studies without providing faculty supervision and that this has been done even for sedated pediatric patients and had led to several unfortunate and well-documented patient mishaps. He further reported several instances involving harmful patient occurrences resulting from substandard care in the radiology department. Dr. Smith further reported that he had repeatedly pointed out to Dr. Sostman and to Mr. Enrico Perez (then New York Presbyterian Hospital, Administrative Director of Radiology) that there are serious deficiencies in the ordering, coding, billing and reporting of radiology exams.

69.    A copy of Plaintiff-Relator Smith's letter to Dean Gotto was also sent to the following persons in October 2002: James Robert Cooke, Dean of the University Faculty, Cornell University; Arthur Mahon, Vice Chairman, Board of Overseers, Joan & Sanford I. Weill Medical College, Cornell University; Herbert Pardes, President & CEO, NY Presbyterian Healthcare System; Maxine Fass, Esq., Senior Vice President, Chief Legal Officer & General Counsel, NY Presbyterian Hospital; Thomas Feuerstein, Chief Compliance Officer, NY Presbyterian Hospital; Hunter Rawlings III, President, Cornell University; Richard D'Aquila, Senior Vice President, Chief Operating Officer, NY Presbyterian Hospital; Steve Forman, Vice

26

President, Corporate Compliance & Audit, NY Presbyterian Hospital; James J. Mingle, Esq.,

University Counsel and Secretary of the Corporation, Cornell University.

70.    Dean Gotto sent a letter to Plaintiff-Relator Smith dated November 6, 2002 which

stated:

I have received your letter, dated October 3, 2002, concerning Dr. H. Dirk Sostman and
the Department of Radiology. ... Your letter raises a number of issues concerning WMC
and the New York – Presbyterian Hospital. I have asked Dr. Joseph G. Hayes, Associate
Dean for Billing Compliance ... to investigate your allegations with respect to WMC and
make appropriate recommendations to me for further action as may be necessary. Dr.
hayes will be assisted by WMC's Office of University Counsel. It is my understanding
that NYPH is reviewing the issues you have raised that pertain to NYPH.

71.    Despite repeated written requests by Plaintiff-Relator Smith to Dr. Hayes, that Dr.

Hayes meet with Plaintiff-Relator Smith in private without the presence of attorneys, Dr. Hayes

refused all such requests.

72.    In March 2003, Plaintiff-Relator Smith wrote again in correspondence, the

content of which is incorporated by reference, to Dean Gotto and reiterated his concerns.

Specifically he wrote again about substandard patient care, patient safety, billing fraud and

compliance violations, and the lack of responsiveness by the Compliance Officer and further

retaliation. He requested corrective action.

73.    On Friday April 11, 2003, Plaintiff-Relator met with the following persons: Dr.

Joseph G. Hayes; James R. Kahn, Esq., Associate University Counsel, Cornell University;

Catherine A. Gursky, Esq., Associate General Counsel, Office of Legal Affairs & Risk

Management, New York Weill Cornell Center. Despite protests from Mr. Kahn, Plaintiff-

Relator Smith read a statement at the beginning of the meeting reporting about his concerns

regarding patient care deficiencies, billing and compliance violations, and the lack of responses

to his reports by the Hospital and University.

27

74.    In response to requests made by Dr. Hayes, Attorney Kahn, and Attorney Gursky at the April 11, 2003 meeting, on April 14, 2003, Plaintiff-Relator Smith provided documentary evidence to Dr. Hayes, which is incorporated by reference herein, relating to the following issues: Monitoring of MRI exams; MRI cases of Dr. Martin Prince the week of October 7, 2002; Contrast administration through a faulty IV line; overnight ultrasound exams not shown to a physician; neck CT; Monitoring of MRI sedation cases; interface email; chest x-rays that were interpreted and reported long after they were obtained and were therefore never utilized for patient care purposes; improper, inadequate and failure of monitoring of inpatient and outpatient ultrasound exams.

75.    Plaintiff-Relator Smith never received a response from Dr. Hayes, Mr. Kahn or Ms. Gursky or, for that matter, anyone else regarding the "investigation of the issues raised by Plaintiff-Relator Smith. Instead, Plaintiff-Relator Smith received a threatening letter dated May 12, 2003 from Steve Forman.

76.    Having received no response to his complaints, in late May 2003, Plaintiff-Relator Smith requested that Dean Gotto grant his request for a leave of absence pending the ongoing investigation. Plaintiff-Relator Smith never received a response.

## VIII.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
### [31 U.S.C. 3729, *ET SEQ.*]

77.    The computerized billing system utilized by Defendant Hospitals for the Technical Component of Radiological Services allows (and in most cases is designed for) the

28

billing of all payers at the time the Radiology Study is taken or created, but prior to any proper interpretation and/or report of the Study. Such Studies that have been completed (i.e., images have been taken or generated by a technologist or other personnel), but for which no proper interpretation by a qualified radiologist has been provided and documented, are often tracked by Hospitals as " "C" Status" or "Completed but Not Read" Radiology Studies. "Un-finalized" or "Non-Finalized" Radiology Studies are those Radiology Studies involving "C" Status Studies where no proper interpretation is ever made and/or documented in a timely fashion relative to the patient's diagnosis and treatment during the patient encounter when the Studies were taken; and/or Studies that were never utilized for diagnostic or therapeutic purposes relative to patient encounters when Studies were taken; and/or for which no required documentation has been created.

78.    The billing systems utilized by Defendant Hospitals to submit billings for Radiology Studies to the Medicare and Medicaid Programs are manufactured by one or more of at least 5 manufacturers, IDX Systems Corporation, Siemens Corporation, McKesson Corporation, Cerner Corporation and Eclipsys Corporation, all of which are manufacturers of the billing software and providers or manufacturers of the hardware.

79.    Upon information and belief, Defendant Hospitals, with the assistance of and in concert with the billing system manufacturers, programmed their billing systems, or bought systems already designed, to generate the Technical Component bill once a study was placed in "C" Status so that they could bill for the Radiology Study regardless of whether it was ever interpreted or used in connection with the diagnosis or treatment of a patient's condition. *The Defendant Hospitals could and should have programmed their billing systems to bill for the Technical Component so long as the Study was used in connection with the patient's diagnosis*

29

*and treatment relative to the patient encounter during which the Study was taken and only after the Study was interpreted by a qualified physician and properly documented, but failed to do so.* This practice has been in place since at least 1985 in some Defendant Hospitals and could have been altered at any time by a simple change in a software option.

80.     Defendant Hospitals have and continue to misrepresent through false certifications and improper use of Medicare and Medicaid reimbursement methods. Radiology Studies they have reported as having been completed at their facilities have been utilized in a timely fashion for patient diagnostic or therapeutic purposes and/or have been adequately documented.

81.     Defendant Hospitals presented and submitted claims to, and received payment from, the Medicare and Medicaid Programs for the Technical Component associated with these worthless outpatient "C" Status Radiological Studies.

82.     Defendant Hospitals presented and submitted claims to, and received payment from, the Medicare and Medicaid Programs for the Technical Component associated with the preliminarily read Radiological Studies of outpatients that were not properly interpreted and/or finalized by a qualified radiologist in a timely fashion relative to the diagnosis and treatment of the patient for the patient encounter during which the Study was taken.

83.     When Defendant Hospitals submitted claims to Medicare and Medicaid for payment for the delivery of Radiology Services comprised solely of the Technical Component, involving Radiology Studies which were never utilized for diagnostic or therapeutic purposes, Defendant Hospitals falsely certified that the Radiology Studies were medically necessary and provided in a timely fashion in accordance with the standard of care.

30

84.     Defendant Hospitals were aware or should have been aware of the fact that they had submitted thousands of claims for payment for outpatient Completed but not Read Radiology Studies and they concealed and covered up the fact that the Radiology Studies for which they had been paid by the Medicare and Medicaid Programs had no diagnostic or therapeutic use to the beneficiaries in violation of 42 U.S.C. § 1320a-7a. *See also* 18 U.S.C. § 1035.

85.     Plaintiff-Relator Smith charges that in performing these acts, Defendant Hospitals, through the acts of their agents, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government to the damage of the Treasury of the United States and the individual states implementing the Medicaid Program in violation of 31 U.S.C. § 3729-3731; 31 U.S.C. § 3802; and Gen. Stat. § 53a-290.

86.     By all of the above, Defendant Hospitals have risked patient safety and failed to provide the minimum level of care required for billing Medicare and Medicaid. The Services were substandard and inadequate in that Defendant Hospitals performed Radiology Studies on outpatient Medicare and Medicaid beneficiaries that were never read or interpreted in time to be utilized in connection with the diagnosis and treatment of the patient relative to the patient encountered during which the Study was taken.

87.     The policies and practices implemented by Defendant Hospitals, continuing up to the present, have encouraged and facilitated the provision of substandard and inadequate Radiological Services to Medicare and Medicaid Program beneficiaries.

88.     The failure by Defendant Hospitals to properly furnish outpatient Radiology Services to Medicare and Medicaid beneficiaries constituted violations of the Defendants'

31

provider contracts with the Programs, the statutes and regulations governing the provision of medical care to Program beneficiaries, the Defendants' internal quality assurance policies and programs and the Defendants' medical billing compliance programs.

89.     All of the above billings for Radiology Studies resulted in improper payments from the Medicare and Medicaid Programs for outpatient patient services.

90.     By virtue of the acts described above, Defendant Hospitals individually and/or in combination or conspiracy, knowingly presented or caused to be presented to officers, employees, or agents of the United States Government and each state implementing the Medicaid Program, false or fraudulent claims for payment or approval, and have used false statements to conceal obligations to refund money to the Medicare and Medicaid Programs. The United States has been damaged as a result in an amount to be proven at trial.

91.     Defendant Hospitals are each liable to the United States for treble the United States' damages, and an additional amount of $5,000- $11,500 for each false claim.

92.     By virtue of the acts described above, Hospital Defendants knowingly presented or caused to be presented to officers, employees, or agents of the United States Government and various individual States, false or fraudulent claims for payment or approval, and have used false statements to conceal obligations to refund money to the Medicare and Medicaid Programs. The United States has been damaged as a result in an amount to be proven at trial.

93.     The Hospital Defendants are to the United States for treble the United States' damages, and an additional amount of $5,000 - $11,500 for each false claim submitted to and paid by the Medicare and Medicaid Programs, together with prejudgment interest on the entirety.

32

## SECOND CAUSE OF ACTION

## VIOLATIONS OF THE FALSE CLAIMS ACT
### [31 U.S.C. § 3730(h)]
### AS AGAINST YNHH AND YALE

94-153. Paragraphs 1 through 59 as set forth in the First Cause of Action are hereby incorporated in this Second Cause of Action as if fully set forth herein.

154.    Because of his investigation and reporting of the frauds alleged herein, Relator Smith was harassed and was discriminated against in the terms and conditions of his employment, by and through the acts of the Defendants' officers, agents, and employees, including Bruce McClennan, M.D., in one or more of the following ways:

a.  he was repeatedly harassed, threatened and subjected to intimidation by Bruce McClennan, M.D.;

b.  his salary was cut;

c.  he was stripped of administrative positions and titles Chief of MRI, Abdominal Imaging, Fellowship Program Director and Coordinator of Abdominal Schedule; and

d.  he was forced to resign from Yale and YNHH.

155.    Because of his investigation and reporting of the frauds alleged herein, Dr. Arthur T. Rosenfield, Professor of Radiology at Yale University, was harassed and discriminated against in the terms and conditions of employment, by and through the acts of the Defendants' officers, agents, and employees, including Bruce McClennan, M.D, in one or more of the following ways:

33

a. he was repeatedly harassed, threatened and subjected to intimidation by Bruce McClennan, M.D.;

b. he was forced to carry an unacceptable work load, even after numerous protests to Dr. McClennan and his Vice-Chairs, Drs. McCarthy, Forman, and Brink, about the inadequate coverage for CT services; and

c. he was stripped of administrative positions and titles at Yale and YNHH and deprived of a major portion of his livelihood.

156. Because of his investigation and reporting of the frauds alleged herein, Dr.

Morton I. Burrell, Professor of Radiology at Yale University, was harassed discriminated against in the terms and conditions of employment, by and through the acts of the Defendants' officers, agents, and employees, including Bruce McClennan, M.D., for reporting and complaining about the Defendants' improper conduct as hereinbefore stated, in one or more of the following ways:

a. he was repeatedly harassed, threatened and subjected to intimidation by Bruce McClennan, M.D.;

b. his salary was cut; and

c. he was stripped of administrative positions and titles at Yale and YNHH.

157. Relator Smith believes and asserts that he was the object of such discrimination because of his investigation and reporting of the frauds alleged herein, including his reports of the substandard patient care issues, improper billing practices and falsification of documents to, among others, the General Counsel of Yale University, Dorothy Robinson, Esq. and the President of Yale University, Dr. Richard Levin.

34

158.    Because of the Defendants' retaliatory conduct set forth above, Relator Smith has

suffered actual and special damages in an amount to be proven at trial, together with

prejudgment interest thereon.

## THIRD CAUSE OF ACTION

### VIOLATIONS OF THE FALSE CLAIMS ACT
### [31 U.S.C. § 3730(h)]
### AS AGAINST
### NEW YORK PRESBYTERIAN HOSPITAL AND CORNELL UNIVERSITY JOAN AND SANFORD I. WEILL MEDICAL CENTER

159.    On July 1, 1999, Plaintiff-Relator Smith commenced his duties as Professor of

Radiology in the Academic Clinical Track at Cornell.

160-206.    Paragraphs 1 through 30 and 60 through 76 as set forth in the First Cause

of Action are hereby incorporated in this Third Cause of Action as if fully set forth herein.

207.    Because of his investigation and reporting of the frauds alleged herein, Plaintiff-

Relator Smith was harassed and was discriminated against in the terms and conditions of his

employment, by and through the acts of Defendant Cornell, and its officers, agents, and

employees, including Dr. Sostman in one or more of the following ways:

> a.    Following his reports about his concerns of improper billing, compliance
> issues and compromises of patient care, as mandated by applicable Hospital and
> Cornell compliance plans, ethical policies, federal and state laws and professional
> ethics, Plaintiff-Relator Smith has been repeatedly disregarded, ignored and
> subjected to harassment by Dr. Sostman;
>
> b.    On or about late June 2002, Defendant New York Presbyterian Hospital
> implemented a change in administrative privileges for the computer systems

35

whereby Plaintiff-Relator Smith lost access to some of the administrative computerized systems, access to which was critical to the performance of his administrative and professional functions;

c.     Plaintiff-Relator Smith was stripped of certain administrative privileges and functions, the result of which impaired his ability to perform some of the integral administrative responsibilities of his position as a Professor and as the Associate Chairman of Radiology at Cornell; and

d.     On June 28, 2002, Plaintiff-Relator Smith was informed that his employment contract and appointment at Cornell and related medical staff appointment at New York Presbyterian Hospital will not be renewed, effective June 30, 2003.

208.   Defendants New York Presbyterian Hospital and Cornell have acted with reckless disregard for Plaintiff-Relator Smith's right to be free of discrimination and retaliation, for the rights of patients to receive ethical and safe medical care and in disregard of the Defendants' obligations to abide by federal laws governing the Medicare and Medicaid Programs as well as their internal policies, procedures and programs purporting to ensure patient safety, ethical professional practice and proper billing for technical and professional procedures furnished to patients by Defendants New York Presbyterian Hospital and Cornell.

209.   Plaintiff-Relator Smith believes and asserts that he was the object of such discrimination and harassment because of his investigation and reporting of the frauds alleged herein, including his reports of the substandard patient care issues, improper billing practices and falsification of documents to, among others, Dr. Sostman and Dr. Hayes.

36

210. Because of the Defendants' retaliatory conduct set forth above, Plaintiff-Relator Smith has suffered actual and special damages in an amount to be proven at trial, together with prejudgment interest thereon. Such damages arise from the fact that Plaintiff-Relator Smith has suffered and will suffer harm to his reputation, loss of income and enjoyment of life's pleasurable activities by the intimidation and coercion, as well as emotional distress caused by the intimidation and coercion and the mental anguish related to being witness to avoidable substandard patient care, compliance violations and illegal medical billing practices.

## FOURTH CAUSE OF ACTION

### DEFAMATION
### AS AGAINST
### NEW YORK PRESBYTERIAN HOSPITAL, CORNELL UNIVERSITY JOAN AND SANFORD I. WEILL MEDICAL CENTER, H. DIRK SOSTMAN AND JOSEPH HAYES

211-258. Paragraphs 159 through 206 as set forth in the Third Cause of Action are hereby incorporated in this Fourth Cause of Action as if fully set forth herein.

259. Because of his investigation and reporting of the frauds alleged herein, false and defamatory statements of and concerning Plaintiff-Relator Smith were published by the Defendants New York Presbyterian Hospital and Cornell to third parties at Weill Medical College of Cornell University and NY Presbyterian Hospital as well as to third parties outside of these institutions.

260. Upon information and belief, the subject of the false and defamatory statements included but were not limited to Plaintiff-Relator Smith's professional practice and competency.

261. Upon information and belief, since the termination of Plaintiff-Relator Smith's professional association at Defendant Cornell when said Defendant refused to

37

renew his contract, the Defendants New York Presbyterian Hospital and Cornell, along with their employees and members of their faculty and Medical Staff, including but not limited to Dr. Sostman and Dr. Hayes, have engaged in a pattern of repressive, unwarranted and pretextual disparagement, in the form of unfounded and false statements about Plaintiff-Relator Smith's reporting and complaints about the compromise of patient care and safety, along with violations of the compliance policies and billing fraud.

262.     Upon information and belief, Dr. Sostman has made false and defamatory statements about Plaintiff-Relator to numerous members of the radiology profession and other individuals.

263.     Upon information and belief, Dr. Hayes also repeated the false statements to other individuals and made other defamatory comments about Plaintiff-Relator Smith to other individuals.

264.     All such statements referenced in Paragraphs 107, 110 and 111 were false.

265.     All such statements were made intentionally and were known to be, or should have been known to be, false.

266.     The falsity of the allegations caused Plaintiff-Relator Smith to suffer harm to his reputation and professional image with his colleagues at Defendant Cornell and New York Presbyterian Hospital and in the community, as well as severe mental and emotional distress.

38

## FIFTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### AS AGAINST
### NEW YORK PRESBYTERIAN HOSPITAL, CORNELL UNIVERSITY JOAN AND
### SANFORD I. WEILL MEDICAL CENTER, H. DIRK SOSTMAN AND JOSEPH HAYES

267-314.    Paragraphs 159 through 206 as set forth in the Third Cause of

Action are hereby incorporated in this Fifth Cause of Action as if fully set forth herein.

315.    Dr. Sostman's and Dr. Hayes's conduct was outrageous and supported by

Defendants New York Presbyterian Hospital and Cornell, their employees,

representatives, Medical Staff and Faculty members as well as the members of their

Boards of Trustees.

316.    Similarly, the conduct of all of the Defendants was intentional and with

knowledge that it would cause Plaintiff-Relator Smith severe emotional distress.

317.    Plaintiff-Relator Smith suffered severe emotional distress caused by said

Defendants' actions and continues to suffer such distress.

## SIXTH CAUSE OF ACTION

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### AS AGAINST
### NEW YORK PRESBYTERIAN HOSPITAL, CORNELL UNIVERSITY JOAN AND
### SANFORD I. WEILL MEDICAL CENTER, H. DIRK SOSTMAN AND JOSEPH HAYES

318-365.    Paragraphs 159 through 206 as set forth in the Third Cause of Action are

hereby incorporated in this Sixth Cause of Action as if fully set forth herein.

366.    The actions of the Defendants and Dr. Sostman and Dr. Hayes was outrageous.

367.    The Defendants' along with Dr. Sostman's and Dr. Hayes' actions were taken under circumstances when they knew or should have known that their conduct involved an unreasonable risk of causing Plaintiff-Relator Smith to suffer injury including physical sickness and severe emotional distress.

## SEVENTH CAUSE OF ACTION

## BREACH OF CONTRACT
## AS AGAINST
## CORNELL UNIVERSITY JOAN AND SANFORD I. WEILL MEDICAL COLLEGE

368-415.    Paragraphs 159 through 206 as set forth in the Third Cause of Action are hereby incorporated in this Seventh Cause of Action as if fully set forth herein.

416.    Defendant's intentional retaliation, discrimination, retaliation and coercion against plaintiff for having spoken out on patient safety and Medicare fraud issues, violated Plaintiff-Relator Smith's rights pursuant to his contract with Defendant Cornell including his academic freedom and such actions constituted a breach of the contract between Plaintiff-Relator Smith and the Defendant, including the implied covenant of good faith and fair dealing and the Defendant's policies on Freedom of Expression and corporate compliance.

417.    Plaintiff has suffered damages resulting from the Defendant's breach of the policy on Freedom of Expression and corporate compliance. Plaintiff-Relator Smith is entitled to all remedies available at law or in equity, including injunctive relief, to remedy this breach.

40

## EIGHTH CAUSE OF ACTION

### VIOLATION OF NY CLS LABOR § 741
### AS AGAINST
### NEW YORK PRESBYTERIAN HOSPITAL, CORNELL UNIVERSITY JOAN AND
### SANFORD I. WEILL MEDICAL CENTER, H. DIRK SOSTMAN AND JOSEPH HAYES

418-465.    Paragraphs 159 through 206 as set forth in the Third Cause of Action are
hereby incorporated in this Eight Cause of Action as if fully set forth herein.

466.    Plaintiff-Relator disclosed to the Chairman of the Department of
Radiology, H. Dirk Sostman, as well as numerous other officials at the Weill-Medical College of
Cornell University and the New York Presbyterian Hospital, in good faith, policies and practices
that Plaintiff-Relator reasonably believed constituted improper quality of patient care; or

467.    Plaintiff-Relator objected to and refused to participate in patient care activities,
patient care and billing policies and practices of Weill-Medical College of Cornell University
and the New York Presbyterian Hospital, that Plaintiff-Relator, in good faith, reasonably
believed constituted improper quality of patient care.

468.    Plaintiff-Relator brought the improper quality of patient care to the attention of H.
Dirk Sostman, as well as numerous other officials at the Weill-Medical College of Cornell
University and the New York Presbyterian Hospital and afforded them a reasonable opportunity
to correct the improper activities, policies and practices.

469.    As a result of Plaintiff-Relator's disclosures to the Chairman of the Department of
Radiology, H.Dirk Sostman, as well as his disclosures to numerous other officials at the Weill-
Medical College of Cornell University and the New York Presbyterian Hospital, Plaintiff-Relator
was subjected to retaliatory action by the Defendants in violation of NY CLS § 741.

41

## IX.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff-Relator Smith prays for the following relief:

1.    An order directing Defendants Yale and YNHH to cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

2.    An order directing Defendants New York Presbyterian Hospital and Cornell University to cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

3.    Judgment against the Defendants, jointly and severally, and in favor of the United States, in an amount equal to three times the amount of damages the United States Government has sustained because of the Defendants' actions, plus a civil penalty of $11,500.00 for each violation of 31 U.S.C. § 3729 (a) proven at trial;

4.    An award to Plaintiff-Relator Smith, of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d), including all costs and expenses of this action, expert fees and expenses and reasonable attorneys' fees;

5.    An award against Defendants Yale and YNHH representing money damages for discrimination including compensatory damages for lost wages, interest, harm, humiliation, embarrassment, mental anguish as well as expert fees and costs and reasonable attorneys' fees for violation of 31 U.S.C. § 3730(h);

6.    Injunctive relief to restrain the Defendants and their officers, agents, employees and servants from harassing, penalizing, or otherwise discriminating and/or retaliating against Plaintiff-Relator Smith at Yale and YNHH for reporting and complaining about possible Medicare and Medicaid fraud and program abuses;

7.    An award against Defendants New York Presbyterian Hospital and Cornell University representing money damages for discrimination including compensatory damages for

lost wages, interest, harm, humiliation, embarrassment, mental anguish as well as expert fees and costs and reasonable attorneys' fees for violation of 31 U.S.C. § 3730(h);

    8.    Injunctive relief to restrain the Defendants New York Presbyterian Hospital and Cornell University and their officers, agents, employees and servants from harassing, penalizing, or otherwise discriminating and/or retaliating against Plaintiff-Relator Smith at New York Presbyterian Hospital and Cornell University for reporting and complaining about possible Medicare and Medicaid fraud and program abuses;

    9.    An award to Plaintiff-Relator Smith of the maximum amount allowed pursuant to NY CLS Labor § 741 including all costs and expenses of this action, expert fees and expenses and reasonable attorneys' fees;

    10.    An assessment of prejudgment and post-judgment interest; and

    11.    Such other and further and different relief, whether preliminary or permanent, legal or equitable as the Court deems just and proper.

43

## X.    DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff-Relator Smith

hereby respectfully demands a trial by jury on all counts herein alleged.

Respectfully submitted,

By: _____

Craig T. Dickinson (CT18053)
MADSEN, PRESTLEY & PARENTEAU, LLC
44 Capitol Avenue, Suite 201
Hartford, CT 06106
Tel:    (860) 246-2466
Fax:    (860) 246-1794

ATTORNEYS FOR
PLAINTIFF-RELATOR SMITH

## CERTIFICATION

I hereby certify that a copy of the foregoing were sent on this 24th day of November 2004 via regular U.S. Mail, postage prepaid to:

Mary Alice Leonhardt, Esq.
Law Offices of Mary Alice Leonhardt, LLC
102 Oak Street
Hartford, CT 06106

Willam J. Doyle, Esq.
Kenneth D. Heath, Esq.
Wiggin & Dana LLP
One Century Tower
265 Church Street, Box 1832
New Haven, CT 06508

David S. Poppick, Esq.
Epstein Becker & Green, P.C.
One Landmark Square
Suite 1800
Stamford, CT 06901

Patrick M. Noonan, Esq.
Delaney, Zemetis, Donahue, & Noonan, P.C.
741 Boston Post Road
Concept Park
Guilford, CT 06437

James R. Kahn, Esq.
Associate University Counsel
Cornell University
445 East 69th Street
New York, NY 10021

Stuart M. Gerson, Esq.
Epstein Becker & Green, P.C.
1227 25th Street, NW
Suite 700
Washington, DC 20037-1175

Alexander J. Lawrence, Esq.
Carl H. Loewenson
Morrison & Foerster, LLP
1290 Avenue of the Americas
New York NY 10104-0050

and that one (1) copy has been mailed in accordance with Rule 5 of the Federal Rules of Civil

Procedure and Rules 7(d) and 7(e) of the Local Rules of Civil Procedure to:

Richard M. Molot, Esq.
Assistant United States Attorney
Office of the United States Attorney
157 Church Street, 23rd Floor
New Haven, CT 06510

Craig T. Dickinson

-45-