**Exhibit B**

SmithDep_1.24.03.txt

0203

VOLUME III

STATE OF CONNECTICUT   : SUPERIOR COURT
JUDICIAL DISTRICT OF WATERBURY
COMPLEX LITIGATION DOCKET
- - - - - - - - - - - - - - - - - - x
                                     :
MORTON BURRELL, M.D.,
ARTHUR ROSENFIELD, M.D.,              :
AND ROBERT C. SMITH, M.D.
                                     :
              Plaintiffs,
                                     : (X02)
        vs.                            CV00-0159421S
                                     :

YALE UNIVERSITY,                      :

              Defendant.              :

- - - - - - - - - - - - - - - - - - x


          Continued deposition of ROBERT C. SMITH,
     M.D., taken pursuant to the Section 243 et
     seq. of the Connecticut Practice Book, at the
     law offices of Wiggin & Dana, One Century
     Tower, New Haven, Connecticut, before
     Janet C. Phillips, License #00124, a
     Registered Professional Reporter and Notary
     Public in and for the State of Connecticut,
     on Friday, January 24, 2003, at 10:15 a.m.


                A P P E A R A N C E S

MADSEN, PRESTLEY & PARENTEAU
Attorneys for the Plaintiffs
P. O. Box 1631
111 Huntington Street
New London, Connecticut  06320
     By:  JACQUES J. PARENTEAU, Esq.

GARRISON, LEVIN-EPSTEIN, CHIMES & RICHARDSON, P.C.
Attorneys for the Plaintiffs
405 Orange Street
New Haven, Connecticut  06511
     By:  JOSEPH D. GARRISON, Esq.

WIGGIN & DANA
Attorneys for the Defendant
One Century Tower
New Haven, Connecticut  06508
     By:  WILLIAM J. DOYLE, Esq.


            A L S O   P R E S E N T

HAROLD ROSE, Esq.
MORTON C. BURRELL, M.D.
ARTHUR ROSENFIELD, M.D.
JAMES BRINK, M.D.
                         Page 1

SmithDep_1.24.03.txt

those orders mean; you're telling me that you're
answering in accordance with your understanding.  I'm
asking you, what is your understanding of what those
orders mean?
                    MR. PARENTEAU:  Let's see, I think
            you're asking him to reveal attorney/client
    ☐       privileged information.
                    MR. DOYLE:  No, I'm not.
                    MR. PARENTEAU:  So I'm asserting the
            privilege.
                    MR. DOYLE:  I'm asking him to tell me
            whether it's his understanding that --
        Q.    In view of Judge Dorsey's recent order, it's
your understanding that there are no limitations on you
answering that question directly; do you understand
that?
                    MR. PARENTEAU:  Wait a minute.  You're
            asking him to reveal attorney/client
            communications.  He said he's answering the
            questions in accordance with the court's
            orders.  That's what you're going to get.
                    MR. DOYLE:  He's told me he's answering
            in accordance with his understanding of Judge
            Dorsey's orders.
                    MR. PARENTEAU:  No, the court's orders.
                    MR. DOYLE:  Court's orders, okay.
                    MR. PARENTEAU:  So you're not going to
            get him to reveal any confidential
            communications between him and his counsel
            regarding interpretation of court orders.
            He's here to answer questions.
    ☐   Q.    Are you holding back in answering that
question for any reason?
                    MR. PARENTEAU:  Object to the form of
            the question.
        A.    Answering what question?
        Q.    The questions I asked you about taping.
        A.    No.  I'm answering the questions in
accordance with the court orders.
        Q.    What's your understanding of what the court
order means?
                    MR. PARENTEAU:  You're asking for
            privileged information.
                    MR. DOYLE:  I don't agree with that.
                    MR. PARENTEAU:  He said he came to a
            conclusion about what his responsibility was
            based on communication with counsel.  I don't
            see how you're not going to violate the
            attorney/client privilege.
                    MR. DOYLE:  Well, we'll see what Judge
            Shiffrin thinks about that.
                    MR. PARENTEAU:  Okay.
        Q.    Doctor, isn't it true that over the years,
you have had problems in the workplace because of the
manner in which you have behaved toward your
colleagues?
    ☐               MR. PARENTEAU:  Object to the form of
            the question.
        A.    No.
        Q.    That's not true?
                    MR. PARENTEAU:  Object to the form of
            the question.
        Q.    Isn't that why you lost your job at Cornell?
                                              Page 4

SmithDep_1.24.03.txt

          MR. PARENTEAU:  Object to the form of
     the question.
     A.   I haven't lost my job at Cornell.
     Q.   You're still working at Cornell?
     A.   Yes.
     Q.   Under the same arrangements that are
reflected in the agreement that you signed with them?
     A.   Absolutely.
     Q.   Aren't you out as of the end of June of this
year?
     A.   No.
     Q.   Has there been any change in your
relationship with Cornell in any way?
          MR. PARENTEAU:  Are you talking about
     his employment relationship?
          MR. DOYLE:  Yes.
     A.   No.
     Q.   Is your contract going to be renewed, do you
know?
     A.   I just received a two-year reappointment.
     Q.   Same position?
     A.   Yes.
     Q.   What's the salary?
     A.   $275,000, approximately.
     Q.   Have you ever had any problems in controlling
your temper in dealing with your colleagues in the
workplace?
     A.   Not that I can think of.
     Q.   While you were at Yale --
          MR. PARENTEAU:  Is there a question?
     Q.   While you were at Yale, did you kick in the
door of Dr. John Murrin's car?
     A.   I did kick -- I don't remember if it was a
door.  I did kick a part of his car, yes.
     Q.   Tell us about that.  What were the
circumstances?
     A.   I had taken my father to the hospital for an
appointment.  Someone's car was parked illegally,
blocking my car in the spot.  My father was very ill,
and it was very difficult or almost impossible for me
to get out of the spot.
     Q.   So you kicked the door of the car?
     A.   I got very frustrated trying to get out, and
yes.
     Q.   You damaged the car, didn't you?
     A.   Yes.
     Q.   And you were called on that behavior by
Dr. Bob White?
     A.   Dr. White spoke to me about it.  I'm not sure
what you mean by called on it.
     Q.   What did he say to you?
     A.   He asked me what had happened, and asked that
I speak with the person who was the owner of the car.
     Q.   He asked you to apologize to your colleague
for kicking in the door of his car, didn't he?
     A.   I don't recall what he specifically asked me
to do.  I did speak to Dr. Murrin, who is actually a
friend of mine, and we worked together without any
difficulties.
     Q.   What did you say to Dr. Murrin?
     A.   I don't remember exactly what I said to him,
other than to tell him that I was sorry about what
happened and I would be happy to pay for the damages.
                         Page 5

**Exhibit C**

VOLUME IV

STATE OF CONNECTICUT   : SUPERIOR COURT

JUDICIAL DISTRICT OF WATERBURY

COMPLEX LITIGATION DOCKET

- - - - - - - - - - - - - - - - - - - x
                                      :
MORTON BURRELL, M.D.,
ARTHUR ROSENFIELD, M.D.,               :
AND ROBERT C. SMITH, M.D.
                                      :
          Plaintiffs,
                                      :   (X02)
     vs.                                  CV00-0159421S
                                      :
YALE UNIVERSITY,                      :

          Defendant.                  :

- - - - - - - - - - - - - - - - - - - x


          Continued deposition of ROBERT C. SMITH,

     M.D., taken pursuant to the Section 243 et

     seq. of the Connecticut Practice Book, at the

     law offices of Wiggin & Dana, One Century

     Tower, New Haven, Connecticut, before

     Janet C. Phillips, License #00124, a

     Registered Professional Reporter and Notary

     Public in and for the State of Connecticut,

     on Thursday, January 29, 2004, at 9:20 a.m.

449

1  Bermuda." Do you know what she's referring to?

2      A.   No.

3      Q.   And she says, quote, You know I want you to

4  be happy but you must battle with your biggest enemy,

5  dash, yourself, and get therapy. What are you waiting

6  for??? I am growing tired and frustrated with your

7  resistance that can only be a good thing for you. Take

8  care, Shirley. Do you know what she's referring to?

9      A.   Yes, Shirley thinks that everybody needs to

10  get psychotherapy.

11     Q.   Okay.

12     A.   She happens to think that that's, you know, a

13  good thing.

14     Q.   Well, did you and she have discussions about

15  how you interact with people and how that might be

16  improved with therapy?

17          MR. PARENTEAU:  Object to the form of

18          the question.

19     A.   No, I don't specifically remember discussing

20  that with her.

21     Q.   You say Shirley was a friend of yours?

22     A.   Yes.

23     Q.   And she says, quote, I am growing tired and

24  frustrated with your resistance to something that can

25  only be a good thing for you. Was Shirley talking to

SCRIBES, INC.

450

1  you on more than one occasion about your getting

2  therapy?

3      A.   As I say, Shirley was a big believer in

4  psychotherapy. It was no secret she herself had been

5  in psychotherapy for many years. And she recommended

6  it to virtually everybody that they get psychotherapy.

7          We even had a fellow candidate once who came

8  in and was actually a bit -- I remember this, they were

9  a bit upset when they came to talk to me. They said

10  that they were talking to Shirley and she actually

11  recommended that they might be helped by therapy. And

12  I said to them, "Don't worry about it, she says that to

13  everybody."

14     Q.   Did you recognize in yourself any problems in

15  dealing with people?

16          MR. PARENTEAU:  Object to the form of

17          the question.

18     A.   In dealing with people?

19     Q.   Yes.

20     A.   I'm sure we can all improve ourselves. I

21  didn't -- I don't think I had any problem that

22  prevented me from doing what I need to do. You know,

23  my primary focus is taking care of patients, doing

24  research and teaching. You know, Yale didn't seem to

25  think there was a problem.

SCRIBES, INC.

451

1      Q.   Pardon?

2      A.   I said Yale didn't seem to think there was a

3  problem until Bruce McLennan decided to put me on his

4  hit list.

5      Q.   Did you have any problems getting along with

6  folks at Cornell after you left Yale?

7          MR. PARENTEAU:  Object to the form of

8          the question.

9      A.   No.

10     Q.   When did you leave Cornell?

11     A.   This past year.

12     Q.   Was that decision to leave entirely

13  voluntary?

14     A.   I think I probably made the decision several

15  years earlier.

16     Q.   You had made the decision several years

17  earlier to leave Cornell?

18     A.   Well, I wasn't going to have much choice,

19  Mr. Doyle. I'm currently finishing my second year of

20  law school. I don't know if you know that. And I

21  started law school in August of 2002. And you have to

22  apply about one year earlier, and obviously you have to

23  think about it and come to that decision before that.

24          So I decided sometime in early 2001 that, you

25  know, because Yale, your client, including

SCRIBES, INC.

452

1  Dr. McLennan, Drs. Brink, Forman, McCarthy, Glickman,

2  Kessler and perhaps others destroyed my career and my

3  reputation in academic medicine -- please let me

4  finish.

5      Q.   Sure.

6      A.   And even after going to Cornell, you know, I

7  had applied for several chairman positions. One in

8  particular at the Hospital of Saint Raphael, which I

9  believe was back in 2000. And I wasn't even offered an

10  interview there. And I happen to know from persons I

11  know there who work on the committee that the reason

12  was because of the bad things that persons at Yale were

13  saying about me.

14     Q.   Who?

15     A.   Who what?

16     Q.   Who at Yale was saying bad things about you?

17     A.   I wasn't given any names. And I decided

18  obviously that it was going to be very difficult for me

19  to achieve what I would have otherwise been able to

20  achieve had your clients not destroyed my career and

21  reputation. And I decided that I would embark on a new

22  career.

23     Q.   Well, when you got to Cornell, you got -- you

24  were making more money at Cornell than you were making

25  at Yale, right?

SCRIBES, INC.

453

1    A.   Yes.

2    Q.   Bruce McLennan and the other folks at Yale

3    didn't prevent you from getting your job at Cornell?

4    A.   They certainly tried to.

5    Q.   But they didn't, did they?  I mean, you got

6    the job?

7    A.   Mr. Doyle, could you please lower your voice?

8    Q.   I'm not raising my voice.

9         MR. PARENTEAU:  I think you are raising

10        your voice.

11   Q.   I'm not.

12   A.   I've answered that question.

13   Q.   Why did you leave?

14   A.   I just told you Mr. Doyle.

15   Q.   You had no problems at Cornell with getting

16   along with folks, is that true?

17        MR. PARENTEAU:  Object to the form of

18        the question.

19   A.   Yes, that's true.

20   Q.   That's true?  Nobody was critical of how you

21   interacted with your colleagues and your superiors?

22        MR. PARENTEAU:  Object to the form of

23        the question.

24   A.   Mr. Doyle, the entire time I was there, I

25   never got anything but outstanding evaluations.

SCRIBES, INC.

454

1    Q.   Did you have any serious disagreements with

2    the folks at Cornell about how the department was being

3    run?

4         MR. PARENTEAU:  Object to the form.

5    A.   I'm sure I had disagreements with people.

6    I'm not sure what that has to do with this case.

7    Q.   I'm just asking.  You were asked to leave,

8    weren't you?

9         MR. PARENTEAU:  Object to the form of

10        the question.

11   Q.   Isn't that true?

12   A.   No.

13   Q.   You could have stayed if you wanted to?

14   A.   I don't know.

15   Q.   You don't know?

16   A.   My contract was not up for another two years.

17   I couldn't tell you.  I certainly couldn't have stayed

18   and pursued my law career.  I'll be graduating in a

19   little more than a year, just so you know.

20   Q.   Are you going full-time to law school?

21   A.   Yes, I am.

22   Q.   When -- are you working at all?

23   A.   I'm going to be working this semester.

24   Q.   As a doctor or as a lawyer?

25   A.   Probably both.

SCRIBES, INC.

455

1    Q.   Where are you going to be working this

2    semester?

3    A.   I don't really care to tell you because I

4    don't want you interfering with my jobs.

5    Q.   You're claiming damages, ongoing damages in

6    the future because of what you call a constructive

7    discharge at Yale, are you claiming damages, ongoing

8    damages in the future, monetary damages?

9    A.   I'd have to speak with my attorney.

10   Q.   Well, why don't you speak to him, because if

11   you are, I want to know the answer.

12   A.   I'll speak to him when I choose, Mr. Doyle.

13   Q.   I'd like the answer to my question.

14   A.   I've answered it.

15   Q.   The answer is you won't answer it?

16   A.   No.  The answer is I have to discuss it with

17   my attorney and I'm not going to discuss at your whim.

18   Q.   Well, I'm here to take your deposition, and

19   that's a question I'd like answered.  So I'd like you

20   to discuss it with him now and let me know whether

21   you're going to answer it or not.

22   A.   That's very nice, but I'm not going to do it.

23   Q.   He's sitting right here.  We can take a

24   break.  You can get some advice and we can go forward.

25   A.   Let's go forward.

SCRIBES, INC.

456

1    Q.   You're not going to answer the question?

2    A.   What is the question?

3         MR. PARENTEAU:  What is the question?

4         MR. DOYLE:  Read it back.

5         (Record read.)

6    A.   I think I answered the question.  I probably

7    will be.

8    Q.   The question is where will you be working?

9    A.   I am currently looking into a couple of

10   things and I don't want you interfering with them,

11   Mr. Doyle.

12   Q.   I'm not going to interfere with them.

13   A.   Your clients have interfered with me for the

14   last time, sir.

15   Q.   Do you claim money damages because you were

16   constructively discharged from Yale University?

17        MR. PARENTEAU:  Object to the form of

18        the question.

19   A.   I'd have to discuss it with my attorney.

20        MR. PARENTEAU:  Why don't we have that

21        discussion.

22   (Recess taken from 11:10 to 11:14 a.m.)

23        (Record read.)

24   A.   I do claim damages.

25   Q.   What are the money damages that you claim

SCRIBES, INC.

457

1 because you were constructively discharged?
2     A.   Damages to my career and reputation, unless
3 my attorney would like to say something.
4          MR. PARENTEAU:  No.  I mean, it is a
5          legal opinion.
6     Q.   Well, in terms of money you were making, you
7 were making more money at Cornell than you were making
8 at Yale, isn't that right?
9     A.   Yes.
10     Q.   And you have voluntarily decided, you
11 voluntarily decided to leave Cornell to become a
12 full-time law student, is that right?
13     A.   That's correct.
14     Q.   Do you claim any loss of salary because you
15 were constructively discharged by Yale?
16     A.   You're asking me a legal question, Mr. Doyle.
17     Q.   You can't answer that?  You think that's a
18 legal question?
19          THE WITNESS:  Jim, do you think that's a
20          legal question?
21          MR. PARENTEAU:  We'd have to have this
22          conversation off the record, you know.  If
23          you think it's a legal question, just state
24          that as your answer.
25     A.   Yes, I think it's a legal question.

458

1     Q.   You can't tell me whether you're claiming
2 loss of salary?
3     A.   Mr. Doyle, please do not raise your voice.
4 I'm going to instruct you that according to the
5 Connecticut Court rule, I am not here to be oppressed,
6 harassed, intimidated by you, and I will not stand for
7 it.
8     Q.   Do you feel intimidated by me?
9     A.   You start raising your voice and I sure do.
10     Q.   I'll say it quietly.
11          You can't tell me whether you're claiming a
12 loss of salary as a result of your constructive
13 discharge, you can't tell me that?
14     A.   I don't know the technicalities, Mr. Doyle.
15 As you pointed out, I technically had a salary increase
16 when I left.  I don't know how these things are
17 calculated legally.  I have to -- I'm asking me a
18 legal question.
19          If you're asking me was my salary higher when
20 I left Yale, I've already answered that.  My salary was
21 higher.
22     Q.   Were you out-of-pocket any money for
23 leaving -- being constructively discharged at Yale and
24 going to work at Cornell at a higher salary?
25     A.   I don't know what you mean by that.

459

1     Q.   Did it cost you any money to do that?
2          MR. PARENTEAU:  Object to the form.
3     A.   To leave Yale?
4     Q.   And go to Cornell?
5     A.   Again, I don't know what you mean by did it
6 cost me any money.  If it cost me $10 to take a train
7 down to New York, that would cost me some money.
8     Q.   But you think I'm asking you a legal
9 question?
10     A.   It certainly seems like it.
11          (Letter marked Defendant's Exhibit 54
12          for identification.)
13          (Letter marked Defendant's Exhibit 55
14          for identification.)
15     Q.   Let me show you 55, too.
16     A.   I'll read them one at a time.
17          (Pause in the proceedings.)
18     A.   Okay.
19     Q.   I'm looking at 54.  You recognize that as
20 your letter you received setting your salary for
21 '97-98?
22     A.   Yes.
23     Q.   And is it correct that your total
24 compensation for '97-98 was $158,462?
25     A.   I believe so.  I don't remember the exact

460

1 number.
2     Q.   And Exhibit 55, is the salary letter for the
3 year 1998-1999.  If you add that up, including the
4 bonus, your total compensation for '98-99 was $158,550,
5 is that right?
6     A.   That's what it says.
7     Q.   Okay.  So your compensation in '98-99 was
8 essentially the same as it was in '97-98?
9     A.   Yes.
10     Q.   And in Exhibit 55, Bruce McLennan has knocked
11 you down five percent on your salary component, but you
12 got it back in a bonus, is that right?
13     A.   No, I mean, he -- it says what it says.  The
14 salary component was decreased five percent.  It's not
15 exactly the same in the bonus, but they're -- I mean,
16 they're separate issues.
17     Q.   I'm just talking about in terms of the total
18 amount.
19     A.   The total amount is very similar, very close.
20     Q.   Okay.
21          MR. DOYLE:  We've marked this earlier.
22          This is an exhibit.  It's Exhibit 7.  We can
23          mark it again if you want, but it's
24          Exhibit 7.
25          MR. PARENTEAU:  This is Exhibit 7 in a