Yale provides these services to the members of its Radiology Department when they furnish the Professional Component of Radiology Services.

33. At all times relevant hereto, YNHH contracted with Yale's Department of Radiology for the purpose of providing high quality Radiology Services to patients at YNHH. Access to YNHH's diagnostic imaging and therapeutic radiology resources is restricted to physicians who are members of Yale's Department of Radiology or who are designated by the Chief as adjunct members of Yale's Department so as to enable the service to fulfill its obligations for patient care education and research.

34. In exchange for providing Radiology Services to patients at YNHH pursuant to the Yale/YNHH Affiliation Agreement, Yale is paid large sums of money by YNHH, including compensation for the loss of patient volume due to the redirection of patients from the YNHH Diagnostic Imaging Department to Temple Radiology at the YNHHASC.

35. Under the terms of the Affiliation Agreement between YNHH and Yale's Department of Radiology, Yale contracted to fulfill a number of duties owed by YNHH to Medicare, Medicaid and its patients. Yale agreed to provide Radiology Services consistent with the prevailing standard of care and in accordance with the applicable federal, state and local rules and regulations, and in compliance with patient care standards required for participation in the Medicare and Medicaid Programs. As members of the YNHH Medical Staff, the members of Yale's Department of Radiology pledged, *inter alia,* to refrain from delegating the responsibility for the diagnosis or care of hospitalized patients to a physician who is not qualified to undertake this responsibility or who is not adequately supervised.

36. At all times pertinent hereto, Bruce McClennan, M.D., was Chairman of Yale's Department of Radiology and Chairman of Yale-New Haven Hospital's Department of

16

Diagnostic Imaging. His duties and responsibilities include, *inter alia*, implementation of Yale's Medical Billing Compliance Plan; Yale's Radiology Department's and YNHH's Radiology Studies record retention system; and YNHH's Diagnostic Imaging Quality Improvement Plan, each of which he implements with the assistance of his Vice Chairs, Howard Forman, M.D., James Brink, M.D., and Shirley McCarthy, M.D. Dr. McClennan, with the assistance of his Vice Chairs, is also responsible for providing administration, supervision and teaching services to the YNHH's GME Residency Program and the oversight of all Hospital support services for the Yale Radiology Department, including, but not limited to, the maintenance of the Film Library and the computerized patient record-keeping system known as the DecRad System.

37. At all times pertinent hereto, David Kessler, M.D., was the Dean of the Yale School of Medicine, and responsible, *inter alia*, for ensuring the integrity of the Medical School education program at Yale; and compliance with all federal and state laws governing medical education, Physicians at Teaching Hospitals ("PATH"), physician billing, and federal and state medical education program funding requirements.

38. At all times relevant hereto, the Faculty members at Yale's Radiology Department were required to abide by the terms of the Yale School of Medicine's Medical Billing Compliance Program and the rules applicable to participating providers in the Medicare and Medicaid Programs.

39. At all times relevant hereto, the Defendants represented to the Medicare and Medicaid Programs and to beneficiaries that: (1) they were committed to providing high quality patient care; (2) they had policies and procedures in place to ensure patient safety and that the quality of care provided to such beneficiaries was consistent with the prevailing standard of care and federal and state laws; and (3) they were committed to ethical business practices.

40. At all times relevant hereto, the Defendants, through the YNHH Quality Improvement Committee and the YNHH Quality Assurance Committee, were responsible for implementing the policies and procedures of the YNHH Department of Diagnostic Imaging's Quality Improvement Plan and the YNHH Quality Assurance Plan.

41. The Dean of the Yale School of Medicine and the Chairman of the Yale Radiology Department, are responsible for implementing and enforcing the Yale School of Medicine's Medical Billing Compliance Program.

42. Starting, on or before July 1996, the YNHH Department of Diagnostic Imaging has maintained a Quality Improvement Program. The ostensible purpose of the program is to ensure that improvements in care and performance are sustained and integrated with other departments and services through continuous monitoring and evaluation activities, including but not limited to data collection and monthly analysis and reporting of whether all Diagnostic Imaging reports are being completed within 48 hours as required by departmental policy. The YNHH Diagnostic Imaging Department is responsible for monitoring and evaluating activities connected with the furnishing of Radiological Services by YNHH and Yale, including the ordering of Radiological Studies and completion of reports to ensure the quality and appropriateness of the care and services provided. *See* YNHH Department of Diagnostic Imaging's Quality Improvement Plan.

43. The Chairman of the YNHH Diagnostic Imaging Department and Yale's Radiology Department is responsible for ensuring that the YNHH Quality Improvement Plan within the Department of Diagnostic Imaging at YNHH was implemented effectively and that the members of the YNHH Department of Diagnostic Imaging as well as the members of Yale's Radiology Department participated in and complied with the applicable policies and procedures

and that corrective measures were taken in a timely fashion to resolve or prevent any deficiencies in compliance.

44.  The computerized billing system utilized by the Defendants Yale and YNHH for the Technical and Professional Components of Radiological Services allows the billing of all payers (including Medicare and Medicaid) for "C" status Radiology Studies which were never utilized for diagnostic or therapeutic purposes and/or for "P" status Radiology Studies for which no final report by a Qualified Physician was ever made.  The Technical Component, that is the taking of the X-ray was performed on February 4, 1999 and reported as a "Completed but not Read" study on or before March 10, 1999.  As indicated on the patient invoice, the Professional Component for interpreting the X-ray was never provided.  Nevertheless; the charge for the taking of the X-ray which was never utilized for diagnostic or therapeutic purposes was paid.  This same billing practice is used by the defendants to bill both Medicare and Medicaid, as well as all other private payers.

45.  Upon information and belief, YNHH programmed the DecRad System to generate the YNHH Technical Component bill once a study was placed in "C" status so that it could bill for the study regardless of whether it was properly used.  YNHH could have and should have programmed the system to bill for the Technical Component only after the Study was put into "F" status but it never did so.  This practice has been in place since 1985 and could have been altered at any time by a simple change in a software option.

46.  Relator Smith estimates that approximately thirty-four percent (34%) of all patients examined at the YNHH Radiology Department are Medicare beneficiaries and eighteen percent (18%) are Medicaid beneficiaries.

47.     Relator Smith has uncovered more than seventy-seven thousand (77,000) Completed but not Read Radiology Studies, and believes that at least ten thousand (10,000) more Studies were read by Residents or Fellows each year but were never reviewed and approved by a Qualified Physician. Approximately fifty-two and one half percent (52.5%) of these Studies are believed to have been taken for Medicare and Medicaid patients. The patient radiology record indicates that no Professional Component was rendered before or after the bill for each such study was submitted to and paid by Medicare or Medicaid.

48.     When YNHH submitted claims to Medicare and Medicaid for payment for the delivery of Radiology Services comprised solely of the Technical Component, involving Radiology Studies which were never utilized for diagnostic or therapeutic purposes, YNHH falsely certified that the Radiology Studies were medically necessary and provided in accordance with the standard of care.

49.     Yale, and YNHH were aware that when YNHH presented and caused to be presented to the Medicare and Medicaid Programs claims for Radiological Studies which had been "Completed but not Read," they were seeking payment for worthless and medically unnecessary items and services in violation of 42 U.S.C. § 1320a–7a(a). *See* 18 U.S.C. § 1035.

50.     Yale and YNHH were aware of the fact that YNHH was improperly submitting claims for Completed but not Read Radiology Studies to obtain payment for Radiological Services that were never rendered. Despite this knowledge, Yale and YNHH failed to take any corrective action or institute procedures to prevent such improper acts and ensure that the Completed but not Read Studies were only billed if a related Professional Component had been furnished to the Medicare or Medicaid beneficiary.

51. Yale and YNHH were aware of the fact that YNHH had submitted thousands of claims for payment for Completed but not Read Radiology Studies and they concealed and covered up the fact that the Radiology Studies for which they had been paid by the Medicare and Medicaid Programs had no diagnostic or therapeutic use to the beneficiaries in violation of 42 U.S.C. § 1320a-7a. *See also* 18 U.S.C. § 1035.

52. Relator Smith charges that in performing these acts, Defendants Yale and YNHH, through the acts of their agents, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government and the DSS to the damage of the Treasury of the United States and the State of Connecticut in violation of 31 U.S.C. § 3729-3731; 31 U.S.C. § 3802; and Gen. Stat. § 53a-290.

53. By all of the above, Defendants have risked patient safety and failed to provide the minimum level of care required for billing Medicare and Medicaid. The Services were substandard and inadequate in that:

    a. Defendants performed Radiology Studies on Medicare and Medicaid beneficiaries which were never read or interpreted by properly Qualified Radiologists in a timely fashion relative to the patient encounter when the Studies were taken in accordance with the Medicare and Medicaid Program requirements;

    b. the Studies were never used in connection with the diagnosis and treatment of patients relative to the outpatient encounter when the Studies were taken;

    c. the interpretations of many Radiology Studies performed on Medicare and Medicaid patients were rendered by Residents and Fellows who lacked the required supervision by Qualified Radiologists;

21

  d. interpretations of Radiology Studies were performed by otherwise unqualified physicians and/or personnel; and

  e. the Studies were never taken or documented.

54. The policies and practices implemented by the Defendants, continuing up to the present, have encouraged and facilitated the provision of substandard and inadequate Radiological Services to Medicare and Medicaid Program beneficiaries.

55. Patients at YNHH were furnished substandard and inadequate Radiology Services for which the Defendants submitted bills to and received payment from the Medicare and Medicaid Programs. Examples of this poor patient care practice are reflected on at least 202 Radiology Studies finalized by Dr. Morton Glickman and on other reports interpreted by the following non-physician YNHH personnel, Residents and Fellows:

  a. Sally Howell (non-physician)  76 Reports

  b. Tony Raccio (non-physician)  22 Reports

  c. Radiology Studies Reports dictated by various Residents and Fellows finalized by "Autosign".

56. Defendant Hospitals presented and submitted claims to, and received payment from, the Medicare and Medicaid Programs for the Technical Component of these associated with these unread and/or substandard and inadequate interpretations of Radiological Studies. On information and belief, Defendants also billed Medicare and Medicaid for the Professional Component of those Studies read by unsupervised Residents and Fellows as is alleged below.

57. Defendant Hospitals were aware of the fact that they were providing substandard and inadequate Radiology Services to Medicare and Medicaid beneficiaries and they knowingly submitted claims for payment from the Medicare and Medicaid Programs for those Services

despite their substandard and inadequate nature and the false information contained in the submissions.

58. The failure by Yale and YNHH to furnish Radiology Services by Qualified Radiologists to Medicare and Medicaid beneficiaries constituted violations of the Defendants' provider contracts with the Programs, the statutes and regulations governing the provision of medical care to Program beneficiaries, the Defendants' internal quality assurance policies and programs and the Defendants' medical billing compliance programs.

59. All of the above billings for Radiology Studies resulted in improper payments from Medicare and Medicaid for patient services.

### B. NEW YORK PRESBYTERIAN HOSPITAL AND CORNELL ALONG WITH THEIR AFFILIATED HOSPITALS

60. At all times relevant hereto, Defendants New York Presbyterian Hospital and Cornell were providers of Medicare and Medicaid services in New York.

61. Defendant Cornell is an entity in the State of New York and is affiliated with Defendant New York Presbyterian Hospital and has an arrangement or contract with Cornell for the provision of Radiology Services.

62. On July 1, 1999, Plaintiff-Relator Smith commenced his duties as Professor of Radiology in the Academic Clinical Track at Cornell.

63. On or about July 1999, Plaintiff-Relator Smith also was appointed as member of the medical staff as Attending Radiologist at the New York Presbyterian Hospital.

64. Pursuant to such employment and appointments, Plaintiff-Relator Smith was required to participate in and abide by, *inter alia*, Cornell Professional Services Billing

Compliance Plan; the Cornell University Policy 4.6, Standards of Ethical Conduct; the New York Presbyterian Hospital's Corporate Compliance Plan; and Cornell Physician Organization Policies and Administrative Procedures.

65. At all times pertinent hereto, Plaintiff-Relator Smith endeavored to meet his contractual, professional and ethical obligations set forth in the aforesaid policies and procedures.

66. In accordance with such policies and procedures, on or about October 1999, and for a period of at least two and one-half years, Plaintiff-Relator Smith has complained about a number of billing, compliance and patient care issues that have existed at New York Presbyterian Hospital and Cornell. These reports and complaints were specifically directed to H. Dirk Sostman, M.D., Professor and Chairman of the Department of Radiology, Senior Associate Dean for Clinical Affairs of Cornell and Radiologist-In-Chief of New York Presbyterian Hospital in e-mails from February and June 2002, the content of which is incorporated by reference herein. Dr. Sostman has ignored and otherwise neglected to take any corrective action or measures purporting to eliminate the billing, compliance and patient care issues.

67. The matters about which Plaintiff-Relator Smith reported and complained to H. Dirk Sostman, M.D. and Hospital and Cornell administrations included the following:

    a. Improperly billing the Medicare and Medicaid Programs and other payers for Completed but Not Read Radiology Studies, (a) the Studies were never used in connection with the diagnosis or treatment of patients relative to the outpatient patient encounter when the Studies were taken; and/or (b) the Studies were not interpreted by properly qualified radiologists in a timely fashion relative to the patient encounter when the Studies were taken in accordance with the Medicare and Medicaid Program

24

requirements; and/or for which no required documentation has been created, a practice which, upon information and belief is a practice which has been going on at the New York Presbyterian Hospital for at least 6 years (probably longer). (It has always involved the Cerner system for scheduling and reporting of radiology exams and until about 3 years ago, Healthquest was used for Hospital billing and now Eagle is used for Hospital billing.);

    b.    A serious problem with the ordering of Radiology Studies at New York Presbyterian Hospital whereby exams are commonly performed without proper documentation of medical necessity. Upon information and belief, this applies to 10-20% of all of the Radiology Studies performed annually;

    c.    The exams that are billed by Cornell are often different than those billed by the New York Presbyterian Hospital for the same patient same exam. Upon information and belief, this occurs because the Cerner system is not kept up to date with the most recent CPT codes. In most instances, the University is billing for the correct exam (since the University billing is done based on a paper form) but the Hospital is not (since it uses the Cerner exam);

    d.    Numerous patient care issues involving substandard care and compromises of patient safety; and

    e.    The Studies were never taken or documented.

68.    In October 2002, Plaintiff-Relator Smith wrote to Antonio Gotto, M.D., the Dean of the Weill Medical College of Cornell University. In this letter, the content of which is incorporated by reference, Dr. Smith reported his concerns and beliefs that Dr. Sostman had (1) acted in violation of the University Standards of Ethical Conduct, the Medical College Professional Services Billing Compliance

25

plan, and the provisions of the faculty handbook; (2) created a hostile work environment in the radiology department and needlessly placed patients, faculty and the university reputation in harms way; and (3) shown intolerance toward others through bullying, intimidation and threatening behavior through his actions against Dr. Smith, whereby he had informed Dr. Smith of his intention not to honor the university contractual obligation with regard to the terms of the contract for faculty appointment. Dr. Smith further advised that he had complained to Dr. Sostman in well-documented communications about serious problems in the radiology department relating to patient care, patient safety, billing and compliance. He also cited to several specific examples of the retaliation foisted upon him by Dr. Sotsman. In addition, Dr. Smith reported the fact that Dr. Sostman had allowed a member of the radiology faculty to perform even complicated MRI studies without providing faculty supervision and that this has been done even for sedated pediatric patients and had led to several unfortunate and well-documented patient mishaps. He further reported several instances involving harmful patient occurrences resulting from substandard care in the radiology department. Dr. Smith further reported that he had repeatedly pointed out to Dr. Sostman and to Mr. Enrico Perez (then New York Presbyterian Hospital, Administrative Director of Radiology) that there are serious deficiencies in the ordering, coding, billing and reporting of radiology exams.

69.     A copy of Plaintiff-Relator Smith's letter to Dean Gotto was also sent to the following persons in October 2002: James Robert Cooke, Dean of the University Faculty, Cornell University; Arthur Mahon, Vice Chairman, Board of Overseers, Joan & Sanford I. Weill Medical College, Cornell University; Herbert Pardes, President & CEO, NY Presbyterian Healthcare System; Maxine Fass, Esq., Senior Vice President, Chief Legal Officer & General Counsel, NY Presbyterian Hospital; Thomas Feuerstein, Chief Compliance Officer, NY Presbyterian Hospital; Hunter Rawlings III, President, Cornell University; Richard D'Aquila, Senior Vice President, Chief Operating Officer, NY Presbyterian Hospital; Steve Forman, Vice

President, Corporate Compliance & Audit, NY Presbyterian Hospital; James J. Mingle. Esq., University Counsel and Secretary of the Corporation, Cornell University.

70. Dean Gotto sent a letter to Plaintiff-Relator Smith dated November 6, 2002 which stated:

> I have received your letter, dated October 3, 2002, concerning Dr. H. Dirk Sostman and the Department of Radiology. ... Your letter raises a number of issues concerning WMC and the New York – Presbyterian Hospital. I have asked Dr. Joseph G. Hayes, Associate Dean for Billing Compliance ... to investigate your allegations with respect to WMC and make appropriate recommendations to me for further action as may be necessary. Dr. hayes will be assisted by WMC's Office of University Counsel. It is my understanding that NYPH is reviewing the issues you have raised that pertain to NYPH.

71. Despite repeated written requests by Plaintiff-Relator Smith to Dr. Hayes, that Dr. Hayes meet with Plaintiff-Relator Smith in private without the presence of attorneys, Dr. Hayes refused all such requests.

72. In March 2003, Plaintiff-Relator Smith wrote again in correspondence, the content of which is incorporated by reference, to Dean Gotto and reiterated his concerns. Specifically he wrote again about substandard patient care, patient safety, billing fraud and compliance violations, and the lack of responsiveness by the Compliance Officer and further retaliation. He requested corrective action.

73. On Friday April 11, 2003, Plaintiff-Relator met with the following persons: Dr. Joseph G. Hayes; James R. Kahn, Esq., Associate University Counsel, Cornell University; Catherine A. Gursky, Esq., Associate General Counsel, Office of Legal Affairs & Risk Management, New York Weill Cornell Center. Despite protests from Mr. Kahn, Plaintiff-Relator Smith read a statement at the beginning of the meeting reporting about his concerns regarding patient care deficiencies, billing and compliance violations, and the lack of responses to his reports by the Hospital and University.

27

74. In response to requests made by Dr. Hayes, Attorney Kahn, and Attorney Gursky at the April 11, 2003 meeting, on April 14, 2003, Plaintiff-Relator Smith provided documentary evidence to Dr. Hayes, which is incorporated by reference herein, relating to the following issues: Monitoring of MRI exams; MRI cases of Dr. Martin Prince the week of October 7, 2002; Contrast administration through a faulty IV line; overnight ultrasound exams not shown to a physician; neck CT; Monitoring of MRI sedation cases; interface email; chest x-rays that were interpreted and reported long after they were obtained and were therefore never utilized for patient care purposes; improper, inadequate and failure of monitoring of inpatient and outpatient ultrasound exams.

75. Plaintiff-Relator Smith never received a response from Dr. Hayes, Mr. Kahn or Ms. Gursky or, for that matter, anyone else regarding the "investigation of the issues raised by Plaintiff-Relator Smith. Instead, Plaintiff-Relator Smith received a threatening letter dated May 12, 2003 from Steve Forman.

76. Having received no response to his complaints, in late May 2003, Plaintiff-Relator Smith requested that Dean Gotto grant his request for a leave of absence pending the ongoing investigation. Plaintiff-Relator Smith never received a response.

VIII. **CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
[31 U.S.C. 3729, *ET SEQ.*]**

77. The computerized billing system utilized by Defendant Hospitals for the Technical Component of Radiological Services allows (and in most cases is designed for) the

28

billing of all payers at the time the Radiology Study is taken or created, but prior to any proper interpretation and/or report of the Study. Such Studies that have been completed (i.e., images have been taken or generated by a technologist or other personnel), but for which no proper interpretation by a qualified radiologist has been provided and documented, are often tracked by Hospitals as " "C" Status" or "Completed but Not Read" Radiology Studies. "Un-finalized" or "Non-Finalized" Radiology Studies are those Radiology Studies involving "C" Status Studies where no proper interpretation is ever made and/or documented in a timely fashion relative to the patient's diagnosis and treatment during the patient encounter when the Studies were taken; and/or Studies that were never utilized for diagnostic or therapeutic purposes relative to patient encounters when Studies were taken; and/or for which no required documentation has been created.

78. The billing systems utilized by Defendant Hospitals to submit billings for Radiology Studies to the Medicare and Medicaid Programs are manufactured by one or more of at least 5 manufacturers, IDX Systems Corporation, Siemens Corporation, McKesson Corporation, Cerner Corporation and Eclipsys Corporation, all of which are manufacturers of the billing software and providers or manufacturers of the hardware.

79. Upon information and belief, Defendant Hospitals, with the assistance of and in concert with the billing system manufacturers, programmed their billing systems, or bought systems already designed, to generate the Technical Component bill once a study was placed in "C" Status so that they could bill for the Radiology Study regardless of whether it was ever interpreted or used in connection with the diagnosis or treatment of a patient's condition. *The Defendant Hospitals could and should have programmed their billing systems to bill for the Technical Component so long as the Study was used in connection with the patient's diagnosis*

*and treatment relative to the patient encounter during which the Study was taken and only after the Study was interpreted by a qualified physician and properly documented, but failed to do so.* This practice has been in place since at least 1985 in some Defendant Hospitals and could have been altered at any time by a simple change in a software option.

80. Defendant Hospitals have and continue to misrepresent through false certifications and improper use of Medicare and Medicaid reimbursement methods. Radiology Studies they have reported as having been completed at their facilities have been utilized in a timely fashion for patient diagnostic or therapeutic purposes and/or have been adequately documented.

81. Defendant Hospitals presented and submitted claims to, and received payment from, the Medicare and Medicaid Programs for the Technical Component associated with these worthless outpatient "C" Status Radiological Studies.

82. Defendant Hospitals presented and submitted claims to, and received payment from, the Medicare and Medicaid Programs for the Technical Component associated with the preliminarily read Radiological Studies of outpatients that were not properly interpreted and/or finalized by a qualified radiologist in a timely fashion relative to the diagnosis and treatment of the patient for the patient encounter during which the Study was taken.

83. When Defendant Hospitals submitted claims to Medicare and Medicaid for payment for the delivery of Radiology Services comprised solely of the Technical Component, involving Radiology Studies which were never utilized for diagnostic or therapeutic purposes, Defendant Hospitals falsely certified that the Radiology Studies were medically necessary and provided in a timely fashion in accordance with the standard of care.